737 So.2d 1275 (1999)
Major BANKS, Christopher Edwards, et al.
v.
NEW YORK LIFE INSURANCE CO., et al.
No. 98-C-0551.
Supreme Court of Louisiana.
July 2, 1999.
*1276 C. Jerome D'Aquila, Charles Sterling Lambert, Jules Burton LeBlanc, III, Randy J. Ungar, LeBlanc, Maples & Waddell, New Orleans; Robert M. Johnston, Debra B. Hayes, Adams & Johnston, New Orleans; Christopher A. Kesler, Houston, TX, Counsel for Applicant.
Eugene R. Preaus, Maura Zivalich New Orleans, Pelleteri, Preaus, Roddy & Krebs; Phillip A. Wittman, Stephen Henry Kupperman, New Orleans, Patrick W. Pendley, Stone, Pigman, Walther, Wittman, Hutchinson, Plaquemine, Counsel for Respondent.
Clare Frances Jupiter, New Olreans, Stephen J. Goodman, Phillip E. Stano, Counsel for Amicus Curiae American Counsel of Life Insurance.

*1277 ON REHEARING
MARCUS, Justice.[*]
In January, 1996, Major Banks and Charles Edwards, individually and on behalf of all other persons similarly situated, filed suit in the Eighteenth Judicial District Court for the Parish of Pointe Coupee, Louisiana, against New York Life Insurance Company (New York Life) and two Louisiana insurance agents for New York Life.[1] Plaintiffs alleged that New York Life used unfair and deceptive practices in the issuance and sale of its insurance policies.[2] Plaintiffs sought damages and a judgment certifying a class composed of all persons who purchased whole or universal life policies from New York Life between January 1, 1982 through December 31, 1994, who are residents of Louisiana and who opted out of the class action settlement styled Willson et al. v. New York Life Insurance Company et al. filed in the Supreme Court of New York.[3] After removal of the case to federal court and remand to the state district court, the plaintiffs moved for class certification. Following an evidentiary hearing, the trial judge rendered judgment certifying the class. New York Life appealed. The court of appeal reversed the judgment of the trial court finding that the claims of the plaintiffs lacked common character, making class certification an abuse of the trial judge's discretion.[4] Upon application of plaintiffs we granted certiorari.[5] On original hearing, we reversed the judgment of the court of appeal and reinstated the judgment of the trial court certifying the class. We concluded that common questions of law and fact predominated over individual issues because each class member stood in the same position with respect to the alleged misrepresentations by the company concerning its life insurance policies and marketing materials.[6]
New York Life applied for rehearing contending that the majority focused exclusively on the purported conduct of New *1278 York Life in reaching the conclusion that common issues of law and fact predominated over individual concerns and failed to consider relevant evidence of each class representative's conduct and experience in its inquiry. New York Life further argued that if misrepresentations were made as plaintiffs claim, they were the result of individual agents making misrepresentations to individual persons in violation of New York Life's policies and procedures. Such individualized matters preclude a finding of common character so as to make class certification a superior vehicle in this case. We granted New York Life's application for rehearing to address these concerns.[7]

Factual Background
Plaintiffs' claims arise from their purchase of various life insurance policies from 1982 through 1994. During this period, the marketing and sale of New York Life policies were conducted by approximately a thousand agents. These agents sold about 101,109 policies to Louisiana residents, of which approximately 1,850 are encompassed within the class. Plaintiffs purchased whole life and/or universal life policies. Beginning in the early 1980's New York Life began to base the method of projecting interest and dividend rates of their life insurance policies on a higher rate of return based upon the market of the past few years rather than a rate previously used. It also began to offer new methods of paying premiums. Some of the purchasers of whole life policies selected the Premium Offset Proposal ("POP") whereby premiums would be paid by automatically deducting them from dividends earned under the policies. Because the POP procedure depends upon the accumulation of dividends that can vary from year to year and are not guaranteed, the utilization of this feature could reduce the number of years that out-of-pocket premium payments must be made but not necessarily void the obligation to pay premiums which remain payable for the life of the policyholders. The New York Life home office developed the dividend scales and interest rates and investment return projections on the policies. Based on these assumptions, premium costs and cash value projections were calculated.
New York Life agents were trained by the home office and marketing materials came from the home office. During the class period, illustrations such as charts and explanatory brochures were available to assist agents in the sales presentations. New York Life alleges that explanatory materials stated that dividends were not guaranteed, and by 1987, software automatically placed on every page of an illustration a notice stating that dividends and cash values were not guaranteed. Sales presentations were individualized. Each agent developed a different relationship with each policyholder. Some policies were sold after numerous conversations and lengthy meetings while others were sold after group presentations at work sites and with very little interaction with premiums being paid through voluntary payroll deductions. Each agent had his or her own method of marketing and selling insurance policies. The record further reveals a diverse group of representative plaintiffs, with varying levels of sophistication and experience who purchased life insurance policies in different years from different New York Life agents in different sales situations.
Major Banks purchased four whole life policies for himself and family members for the purpose of accumulating cash values that could later be borrowed against to pay college expenses. He met his agent at work after a group presentation. The agent provided Banks with illustrations showing the premiums and potential cash value of the policies. Major Banks stated that he read the language on the illustrations stating that values shown are based on current dividends which are not guaranteed. He complains that the illustrations he saw at the presentation differed from those attached to his policies and *1279 further alleges that he was told by his agent that his policies would accumulate cash value after the third year. He has retained each policy and they have accumulated some cash value and he has also purchased another policy.
Rosetta Nelson, who owned insurance from several different companies, purchased employee whole life policies on the lives of her children in 1992 for the purpose of obtaining death benefits from two New York Life agents who visited the work site. She conversed with only one agent and was not given any illustrations prior to her purchase. She complains that she was not informed of the additional benefits of her life insurance policies when she bought them.
Marilyn Ferrara bought her policy from an agent she had known for years. She has owned other New York Life policies. She met with the agent only once and saw no illustrations. She chose to pay her premium over a five year period for a total of $23,640 but ceased paying and surrendered her policy after paying $21,000. Upon surrender she received $336 over the $21,000 she had paid in premiums.
Lloyd Price knew his agent, met with him several times and complained that based on the illustrations he received, he thought the accumulated dividends and cash values on his whole life insurance policy were guaranteed to "POP" after eight years. He complains that his agent did not emphasize the writing on the illustrations that dividends were not guaranteed and out-of-pocket payment of premiums may be required. As of the date of the certification hearing, the eight year period had not expired and his policy was still in force.
Linda Joseph purchased the policies at issue after a divorce. She had owned other New York Life policies. Her agent advised her to surrender two existing policies and use the cash value as the initial payment on a new universal life policy to get a greater death benefit at a lower premium. She complains that she thought her policy would have greater cash value although she admitted she took a loan out against the policy and she did receive a net gain in cash value after paying costs and expenses.
Lorraine LeBlanc, a bank executive, thought when she purchased her policy she would pay only one initial premium, but found out in 1993 that dividends were not sufficient to pay premiums under her "POP" plan. She was given illustrations by her agent that she did not read. Her policy is still in effect and she has only paid her initial premium with the others satisfied by deductions from the policy amount.
Last, Opal Michel, a real estate broker, has owned life insurance for many years, knew her agent for many years and met with him several times. The agent provided illustrations. She complains that the actual cash values of the policies are not the same as the amounts reflected on the illustrations. She has not paid any out-ofpocket premiums except for the initial payment.

LAW
La Code Civ. P. arts. 591 through 597 establish the basic requirements for a class action in Louisiana:[8]
1. A class so numerous that joinder is impracticable, and
2. The joinder as parties to the suit one or more persons who are
(a) members of the class, and
(b) so situated as to provide adequate representation for absent members of the class, and
3. A "common character" among the rights of the representatives of the class and the absent members of the class. *1280 See McCastle v. Rollins Environmental Services of La., Inc., 456 So.2d 612, 616 (La.1984); State ex rel. Guste v. General Motors Corp., 370 So.2d 477, 479 (La. 1979)(on rehearing). In Stevens v. Bd. of Trustees of Police Pension Fund, 309 So.2d 144, 151 (La.1975), we noted that existence of a common question of law or fact does not by itself justify a class action as involving a common character of the right to be enforced even though the parties are too numerous to be joined practicably and even though adequate representation is afforded by the class members to the suit. The requirement of a "common character" restricts the class action to those cases in which it would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results. In determining whether a class action in a particular case will promote fairness and efficiency, the trial court must actively inquire into every aspect of the case and should not hesitate to require showings beyond the pleadings. McCastle, 456 So.2d at 616-618.
La.Code Civ. P. arts. 591-597 were modeled after Federal Rule 23 as originally enacted. After amendment of Rule 23 in 1966, our courts have used the factors set forth in Rule 23(b) as guidelines to determine whether to allow a class action. Stevens, 309 So.2d at 150-151. Recently in Ford v. Murphy Oil U.S.A., Inc., 96-2913 (La.9/9/97); 703 So.2d 542, this court directed Louisiana courts to be guided by the standards for class certification set forth in Rule 23(b).[9] Rule 23(b)(3) provides that the court must find that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. To determine whether common issues predominate, a crucial question is whether the case would be manageable as a class action. The trial judge is given wide discretion in determining whether to allow class actions using the factors listed in Rule 23(b) and the "fairness" factors enunciated in Stevens. See Ford, 703 So.2d at 547-548.
Applying the factors set forth in Articles 591-597 and Federal Rule 23 and the state and federal jurisprudence interpreting our state articles and the federal rule, we find for the reasons set forth below that the trial judge abused his discretion in certifying this case as a class action.

ANALYSIS
In Ford, we refused to certify a class of individuals and property owners who alleged physical, property and business losses as a result of emissions from four separate petrochemical plants. In rejecting *1281 the appellate court's finding that the issue of defendant's duty predominated over individual questions, this court reasoned:
However, far from offering the same facts, each class member will necessarily have to offer different facts to establish that certain defendants' emissions, either individually or in combination, caused them specific damages on yet unspecified dates (which dates may run into the hundreds or even thousands). The causation issue is even more complicated considering the widely divergent types of personal, property and business damages claimed and considering each plaintiffs' unique habits, exposures, length of exposures, medications, medical conditions, employment, and location of residence or business.... Lastly, the mere finding of "defendants' duty" not to pollute will do little to advance the issues in this case. There appear to be far too many individual liability issues which could not be tried separately, as that is prohibited by article 593.1(C)(1). 703 So.2d at 549.
Because the individual liability issues predominated over the issue of defendant's duty, we concluded that a class action was not appropriate. Like Ford, when we focus upon the allegations of each of the seven representative class members, we are exposed to a myriad of individualized complaints that ultimately will require plaintiff-by-plaintiff adjudication of liability issues thereby militating against a finding of predominance of common character and the superiority of the class action procedure.
First, we recognize the essence of plaintiffs' claims are fraud and negligent misrepresentation causes of action committed by New York Life and its agents. In Young v. Ray Brandt Dodge, Inc., 176 F.R.D. 230 (E.D.La.1997), plaintiffs brought suit for certification of a class of Louisiana automobile buyers who purchased and financed liability insurance from defendants. In denying certification the court reasoned that because the underlying claims are based on fraud, a reliance of each aggrieved person as to each credit purchase must be shown. A fraud class action cannot be certified when individual reliance will be an issue. Castano v. Am. Tobacco Co., 84 F.3d 734, 745 (5th Cir. 1996); Kirkham v. Am. Liberty Life Ins. Co., 30,830 (La.App. 2nd Cir. 8/19/98); 717 So.2d 1226, 1229, (quoting Simon v. Merrill Lynch, 482 F.2d 880, 882 (5th Cir. 1973))(if there is any material variation in the representation made or in the degree of reliance thereupon, a fraud case may be unsuited for treatment as a class action). In determining whether fraudulent or negligent misrepresentations have occurred, the circumstances surrounding each purchase by each policyholder must be examined to determine whether the purchaser relied on representations made either in written documents or by a particular agent and if so, whether the representations affected the circumstances of each sale.[10]
The misrepresentations in this case were allegedly written in the illustrations and based upon oral statements by the individual insurance agents. For example, plaintiff Ferrara testified that her agent did not show her illustrations. Plaintiff Michel alleges that she relied upon oral representations made by her agent that contradicted the illustrations that were provided. Major Banks claims the illustrations he saw prior to purchase differed from those received with his policies and he further claims that his agent told him he would accumulate cash value on his policy. We find that the trial court would be required *1282 to scrutinize each plaintiff's case individually to determine whether the oral representations were at odds with the written disclosures and analyze whether plaintiffs relied upon oral statements, written materials or both. In In Re Jackson Nat. Life Ins. Co. Premium Litig., 183 F.R.D. 217 (W.D.Mich.1998), plaintiffs sought class certification claiming as their core theory that Jackson National's vanishing premium illustrations, which were prepared by staff in the home office, were premised upon unsupported and unsustainable interest rates. In finding plaintiffs' predominance assertion lacking, the court stated:
It is acknowledged by plaintiffs that Jackson National did not generally communicate directly with prospective consumers or policyholders. Communications were made primarily by independent insurance brokers; brokers who were not subject to and did not follow uniform policies regarding distribution of policy illustrations. Some shared available illustrations with consumers, some did not.
. . .
Thus, determination of whether and which illustrations were given to class members, and of the nature of oral representations made to them at the point of sale, elements of obvious and undeniable importance to all of plaintiffs' claims, are matters requiring individualized fact development. This militates against a finding that the common questions of fact posed even by plaintiffs' narrowed core theory predominate. 183 F.R.D. at 221.
See also Peoples v. Am. Fidelity Life Ins. Co., 176 F.R.D. 637, 645 (N.D.Fla.1998)(certification denied where reliance by the purchaser on both the oral presentations and written materials will result in mini-trials for thousands of purchasers); Rothwell v. Chubb Life Ins. Co. Of Am., No. 96-83-B (D.N.H. March 31, 1998)(certification denied where court found that policy illustrations were nonuniform and each insurance agent used individualized sales practices).
The next issues that plaintiffs must prove on a class-wide basis are causation and injury-in-fact. In a tort action, plaintiff bears the burden of proving by a preponderance of the evidence both the injury and a causal connection between the injury and the tort. Lasha v. Olin Corp., 625 So.2d 1002, 1005 (La.1993). Again, when individualized questions of causation and injury predominate over common issues then class certification is inappropriate. In Brown v. New Orleans Public Service, Inc., 506 So.2d 621, 623 (La.App. 4th Cir.), writ denied, 508 So.2d 67 (La. 1987), the court of appeal explained that in a mass tort class action, the causative link between the defendant's conduct and the plaintiffs' injuries is the same for all plaintiffs and the only issue that varies is the extent of damages. However, the court found that the case did not present such a situation when each member of the class had to prove that the utility's negligence as a result of a power outage caused the injury rather than some other cause such as the extremely cold temperatures, a cause for which the utility company could not be held liable. In Banks v. Travelers Ins. Co., 60 F.R.D. 158 (E.D.Pa.1973), plaintiffs sought class certification based upon allegations that a sales representative of Travelers intentionally made false statements regarding the terms of a disability insurance policy. In refusing to certify the class, the court concluded:
To collect money damages, each plaintiff must show which false statements he heard and which of those statements he relied upon in the purchase of the insurance. Each must then prove that he has a medical disability and that his individual different medical condition fell between the terms of the insurance policy and the representations made. That is, each must show that the misrepresentation caused the loss. Finally, they must prove that each member of the class complied with the contractual preconditions for collection of benefits.... Consequently, a judgment for one plaintiff *1283 would have very little effect on the outcome of another suit. 60 F.R.D. at 163.
Proof of causation and injury-in-fact in the instant case could be complex and individualized. For example, it is uncertain from the depositions of plaintiffs Ferrara and Joseph whether they suffered any injury at all. Joseph acknowledged that the failure of her policy to accumulate cash value as quickly as contemplated may have resulted from her action in taking a loan against the policy. It is questionable whether either plaintiffs LeBlanc and Michel have suffered any injury in that their policies with New York Life are still in effect and they have yet to pay any out-ofpocket premiums. We conclude in the instant case that causation and injury-in-fact will be difficult if not impossible to prove on a class-wide basis since each member of the class must prove that the alleged fraud or misrepresentation and not some other cause resulted in an injury to him.
Finally, we should consider the possibility that New York Life may assert affirmative defenses to plaintiffs' allegations such as comparative fault and prescription. In Brown, 506 So.2d at 623, the court of appeal noted that the availability and validity of defenses such as comparative negligence will depend upon the actions of each claimant under the particular circumstances of his alleged loss. The conduct of many of the named plaintiffs in this case demonstrates their own comparative fault could reduce or even eliminate the potential for recovery. Some were sophisticated life insurance buyers, while others admitted they failed to read their policies and pay attention to the illustrations given to them by their agents. Moreover, some claims may be prescribed in that plaintiffs were aware of the alleged misrepresentations based on the policy's failure to perform as expected and may have failed to take timely action.
In sum, we conclude that there are too many individual issues affecting New York Life's and its agents' liability in this case to find that common issues predominate. As stated in In Re Ford Motor Co. Vehicle Paint Litig., 182 F.R.D. 214, 220 (E.D.La. 1998), "[w]hen defendant's conduct means different things for different class members, trying the issue of its liability for that conduct on an aggregated basis is problematic." Moreover, we conclude that a class action would not be superior to other procedural methods in this case when we balance in terms of fairness and judicial efficiency the merits of a class action against alternative procedural methods. Plaintiffs argue that many claims are small and they are without the means to pursue their claims on an individual basis; therefore, fairness dictates that we certify this class. While we realize the expense to class members in having to pursue their claims in individual lawsuits, nevertheless, we cannot find a class action which would result in a multitude of mini-trials to be superior under the circumstances of this case.
Accordingly, we find that the trial judge abused his discretion in granting class certification in this matter. The court of appeal was correct in reversing the judgment of the trial court.

DECREE
For the reasons assigned, the judgment of the court of appeal is affirmed. The case is remanded to the trial court for further proceedings consistent with the views expressed herein. All costs are assessed against plaintiffs.
CALOGERO, C.J., dissenting.
I respectfully dissent. The plaintiffs' complaints originate from the allegation that New York Life, as a corporate entity, engaged in consumer fraud when it sold insurance policies to them, representing as a major benefit the policies' ability to build cash value, with the knowledge or likely knowledge that its premium offset proposal was not sufficient to pay all future premiums beyond a limited period as projected, and that the policyholders would eventually have to resume paying regular premiums. The insurance products and the associated premiums necessary *1284 to keep the policies in force were developed by New York Life itself with certain dividend scales, values, assumptions, mortality experience, expenses, lapse rates, interest rate and investment return projections. According to plaintiffs' allegations, premium costs and cash value projections were then calculated and marketed by New York Life to the public in the form of materials provided by New York Life and through sales agents trained by New York Life. Those materials cited as a major benefit to the policy holder the policy's ability to build cash value and, in a short time, enable policy coverage without future premium payments for the remaining life of the policy. Underlying the plaintiffs' allegations of fraud, use of deceptive sale practices, and breach of its duty of good faith is the common complaint that the policies did not generate sufficient cash value to perform as represented. The source of contention in this case is a corporate decision to market and sell policies which the corporation allegedly knew or should have known would not produce the benefits projected. I believe that common issues do predominate over individual ones, and that the causative link between New York Life's conduct and the plaintiffs' injuries is indeed the same for all plaintiffs.
Moreover, the district court in this case found class certification appropriate. Recognizing the vast discretion imparted to the district court judge in making such a determination, I cannot say that there was an abuse of that discretion in this case. This is why I subscribed to the majority opinion on original hearing and would now on rehearing reinstate that judgment of this Court.
NOTES
[*] Kimball, J., not on panel, recused. See Rule IV, Part 2, § 3. Victory, J., recused. Judge Marc T. Amy, Court of Appeal, Third Circuit, sitting by assignment in place of Justice Jeffrey P. Victory.
[1] The petition was amended several times to add five more plaintiffs as class representatives and several other Louisiana insurance agents as defendants.
[2] Plaintiffs set forth seven allegations in their petition that New York Life (I) used unfair or deceptive practices when it issued whole life or universal life insurance policies by (a) making use of a premium offset proposal plan and failing to advise plaintiffs of the consequences (b) portraying life insurance policies as investments, savings or retirement plans without disclosing the true nature of the policies (c) carrying out the replacement of existing life insurance policies with new policies or funding new policies in whole or part by using an existing policy's cash value in order to obtain premiums and sales commissions and (d) overstating dividends and benefits to be realized; (II) breached its duty of good faith and fair dealing to its clients by the conduct set forth in Count(I); (III) committed fraud by materially misrepresenting the amount of dividends plaintiffs were to receive under their policies; (IV) committed fraud in the inducement of plaintiffs to purchase policies by materially misrepresenting the benefits to be realized under the policies and failing to disclose the costs and profits of the company; (V) committed negligent misrepresentation and omission in the sale of its life insurance policies; (VI) committed negligence by violating the duty to plaintiffs and class members to use ordinary care and diligence in the sale of its policies; and (VII) breached its oral and written contracts with plaintiffs when it promised that a single prepayment of premiums at the time of purchase or payment of premiums during a fixed period of years would be sufficient to carry the cost of the policies for life without reducing the death benefit of the policies and by failing to furnish an investment plan product suitable for each purchaser's purposes.
[3] No. 94/127804, N.Y. Misc. LEXIS 652 (N.Y.Sup.Ct. Nov. 8, 1995), aff'd 228 A.D.2d 368, 644 N.Y.S.2d 617 (1996), cert. dismissed sub nom., Zoller v. New York Life Ins. Co., 521 U.S. 1112, 117 S.Ct. 2500, 138 L.Ed.2d 1006 (1997).
[4] Banks v. New York Life Ins. Co., 97-0837 (La.App. 1st Cir. 12/29/97); 705 So.2d 1168.
[5] 98-C-0551 (La.5/29/98); 719 So.2d 1270.
[6] 98-C-0551 (La.12/7/98); 722 So.2d 990.
[7] 98-C-0551 (La.3/12/99); ___ So.2d ___.
[8] Arts. 591-597 were amended and reenacted by La. Acts 1997, No. 839, § 1, eff. July 1, 1997. However, the amended version does not apply to this action since it was commenced in January of 1996.
[9] Rule 23(a) sets forth four threshold requirements that must be satisfied before a case is certified as a class action: One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

In addition to satisfying these four prerequisites, the party seeking class certification must show that the action falls within one of the categories listed in Rule 23(b). In this case, plaintiffs seek to certify the class pursuant to Rule 23(b)(3), which provides that the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in their particular forum; (D) the difficulties likely to be encountered in the management of a class action.
[10] The record reflects that New York Life instructed its agents (who became independent contractors after three years) in writing that the illustrative scale of dividend payments was not guaranteed and that out-ofpocket premium payments could be required beyond the illustrative dates. New York Life further cautioned its agents to take special care in selling smaller policies under the premium offset plan. Finally, New York Life emphasized that policies should be sold under the premium offset plan only after full disclosure that premiums were not guaranteed.