921 So.2d 106 (2005)
Camille U. CHIARELLA and Joseph Chiarella, et al.
v.
SPRINT SPECTRUM LP, Sprint Communications Company LP, Sprint PCS, Cox Communications, Telecommunications, Inc., Comcast, Corp., American Personal Communications, Campo's Electronics Appliances and Computers, Inc., Circuit City Stores, Inc., et al.
No. 2004-CA-1433.
Court of Appeal of Louisiana, Fourth Circuit.
November 17, 2005.
*109 Anthony J. Milazzo, Jr., Miranda Warwick Milazzo Giordano & Hebbler, Metairie, LA, for Plaintiffs/Appellees.
Russell S. Jones, Jr., Heather A. Suve, Shughart Thomson & Kilroy, P.C., Kansas City, MO and John F. Olinde, Douglas L. Grundmeyer, Chaffe McCall, L.L.P., and Jan T. Van Loon (Deceased), Oats & Hudson, New Orleans, LA, for Defendants/Appellants.
(Court Composed of Chief Judge JOAN BERNARD ARMSTRONG, Judge PATRICIA RIVET MURRAY, and Judge MAX N. TOBIAS, Jr.).
MAX N. TOBIAS, Jr., Judge.
The defendants, Sprint Spectrum LP, Sprint Communications Service Company LP, Sprint PCS, Cox Communications Company, Tele-Communications, Inc., Comcast Corp.[1] [hereinafter collectively "Sprint Defendants"], American Personal Communications, Campo's Electronics Appliances and Computers, Inc., Circuit City Stores, Inc., Dillard's Department Stores, Inc., Mobile-One Auto Sound, Inc., Office Depot, Inc., The Sharper Image, Inc., Affordable Cellular & Beepers, Inc., New Orleans Video & Audio Distributors, Inc., First Communications Company, Inc., Executone Systems Company of Louisiana, Inc., Tandy Corp. d/b/a Radio Shack, and DX World Electronics [hereinafter collectively "Retail Defendants"], appeal an interlocutory judgment of the trial court granting the plaintiffs' motion to certify a class of persons who received Sprint Personal Communication Services ("PCS") wireless services from May 1997 to April *110 1999.[2] After reviewing the record and applicable law, we reverse the judgment of the trial court.
The plaintiffs, Camille U. Chiarella, wife of/and Joseph Chiarella, John Gilley, Jr., Good Streak Marine, Inc., Frank Larre, Martin Longsdon, Benjamin Barnes, Felix Celestin, Lydia Cousins, Lionel Cox, David Danna, Gail Gibson, wife of/and Karl Gibson, Karla Golden, Jack Jensen, Steven Lyons, Gilton Matt, Deborah Nobles, wife of/and Johnny Nobles, Jr., Joseph Rollins, Lynette Scott, David Verret, Tracey Winfield, Dennis York, Dr. Fritz Fidele, Daniel Wagner, Mark Ippolito, Catherine Ippolito, and Transportation Consultants, Inc., filed suit on 31 October 1997, alleging that both the Sprint Defendants and Retail Defendants made various misrepresentations about the wireless service, marketed as "Sprint PCS," thereby causing damage to the plaintiffs. The plaintiffs asserted claims for breach of contract, fraud, negligent information, breach of warranty, and violations of the Louisiana Unfair Trade Practices Act. The plaintiffs originally sought certification of a class defined as follows:
Persons or entities who reside in the State of Louisiana, are domiciled in the State of Louisiana or do business in the State of Louisiana and who purchased, entered into a contract, uses or used, subscribes or subscribed, receives and/or received the wireless phone service marketed as and trademarked as Sprint PCS which was developed, designed, marketed, advertised, sold, distributed, or otherwise made accessible by the defendants to the class.
The original petition and subsequent supplemental and amending petitions set forth the names of twenty-nine class representatives. It is alleged that some of these plaintiffs purchased their phones directly from the Sprint Defendants, while others purchased their phones from the Retail Defendants. The petition, as amended, focuses on alleged false representations made to the plaintiffs with the intent to deceive and defraud the class members and to induce them to purchase phones sold by the Sprint Defendants and Retail Defendants and subscribe to the Sprint PCS wireless service. The petitions further allege that the class members justifiably relied on the misrepresentations made by all the Sprint Defendants and Retail Defendants, thereby purchasing phones marketed by Sprint Defendants and Sprint PCS wireless services.
The trial court heard the motion for certification on 10-11 February 2004. At the hearing, the plaintiffs narrowed their class definition, seeking certification of a class defined as:
[A]ll individuals, whether its [sic] people or businesses, corporations, or other entities, who subscribed to Sprint PCS wireless service or who purchased a Sprint telephone in the Greater New Orleans market, from the date of launch, which, I think, is May 1997, and for two years thereafter.
Based on that definition, the parties agreed that there were about 60,000 persons in the New Orleans area who were Sprint PCS wireless subscribers during that two-year period.
The plaintiffs offered testimony from five of the twenty-nine named plaintiffs and one expert witness. The Sprint Defendants and Retail Defendants presented the testimony of three fact witnesses and one expert witness. On 12 May 2004, the trial court granted the motion and certified a class larger than that requested by the *111 plaintiffs at the class certification hearing, but as specified in their initial petition. The reasons for judgment issued the same day contain no findings of fact or references to the evidence presented at the certification hearing.
The Sprint Defendants and Retail Defendants filed the instant interlocutory appeal and have set forth the following assignments of error for review:
1. The district court erred in finding that plaintiffs demonstrated that issues of law and fact common to the members of the class predominate over questions affecting only individual members and that a class action is the superior method for the fair and efficient adjudication of this case.
2. The district court erred in finding that plaintiffs demonstrated that class action treatment of this class satisfied the numerosity requirement for class certification.
3. The district court erred in finding that plaintiffs demonstrated that class action treatment of this case satisfies the typicality and adequacy requirements for class certification.
4. The district court abused its discretion in certifying an overly broad class.[3]
We summarize the testimony presented at the certification hearing as follows. The plaintiffs' suit against the Sprint Defendants and Retail Defendants alleges that the Sprint PCS wireless system installed by the Sprint Defendants in the New Orleans area and the telephones sold with that system did not provide the plaintiffs with the services to which they were entitled and for which they had bargained. In particular, the testimony focused on the high volume of blocked and dropped calls experienced by those plaintiffs who testified, as well as the their inability to place and/or receive calls in geographical regions that the Sprint Defendants and Retail Defendants allegedly represented were available for use.[4]
Karl Gibson was the first plaintiff to testify. As a pharmacist for a home infusion company, Mr. Gibson was often in his car performing site visits to patients' homes and doctors' offices. Before obtaining Sprint PCS wireless service, he was told by a couple of friends that the service was not very good, that it could not be used in some places, but that the price could not be beaten. He went directly to a Sprint Defendant's store and talked to a salesman. Mr. Gibson asked if there was coverage on Interstate-10 ("I-10") between New Orleans and Tallahassee, Florida; in Houston, Texas; in Baton Rouge; and in the New Orleans area. He was told that there was no service in Houston, Baton Rouge, and on the I-10 at that time, but that it would be available in the future. Mr. Gibson testified that he probably saw a coverage map, which showed no service on I-10 east of the Mississippi state line or west of St. John the Baptist Parish, Louisiana. Armed with these facts, Mr. Gibson bought a cell phone sold by the Sprint Defendants in July 1997.
Mr. Gibson testified that he quickly found that he could not make or receive *112 calls in certain areas of the city. He also stated that he would experience dropped calls on the Huey P. Long Bridge and Crescent City Connection ("CCC"), both bridges over the Mississippi River. In January 1998, Mr. Gibson stopped using his cell phone. He admitted being told about the 30-day money back guarantee, but chose not to use it. In addition, he testified that he could not determine from looking at his bills or otherwise which of his calls were blocked or dropped. Despite his dissatisfaction with the service, Mr. Gibson was billed for 1,880 minutes of use in September 1997.
Gail Gibson (Karl Gibson's wife) testified that she purchased a Sprint PCS phone in July 1997 by calling an 800-number. She asked about cost, which was very important to her, and whether there was coverage between New Orleans and Baton Rouge, which was a critical consideration; as part of her job, Mrs. Gibson often traveled to and from Baton Rouge. She was told that there was coverage, so she bought a phone. She did not see any coverage maps or brochures and did not know about the 30-day money back guarantee. She did not have a term agreement with the Sprint Defendants that required her to keep the service for any period of time.
Mrs. Gibson testified that she had dropped calls on the CCC and that 30%-40% of her calls in New Orleans were blocked. She also learned that the Sprint Defendants did not yet have coverage in and around Baton Rouge. She admitted that if the average number of blocked calls in New Orleans was then 4%-7%, she was not a typical customer.
Q. You stated that thirty to 40% of your calls didn't go through the first time?
A. Correct.
Q. Now, again, Mrs. Gibson, if we told you that the average in New Orleans in performance was four, five, six, 7% of people saying they had calls that didn't go through the first time, would you say that you were not typical?
A. Yes, I would. Yes, if that's the case.
Mrs. Gibson also admitted that she experienced more dropped calls than was typical for the New Orleans area for that time period. Mrs. Gibson kept her phone until December 1998, when she bought a car that came equipped with a mobile phone.
Joseph Chiarella testified that he bought a phone sold by the Sprint Defendants for his wife, Camille, in June or July 1997 after seeing advertisements for the service. He bought the service by calling an 800-number. He was told that there was coverage throughout the entire 504 area code. Although he and his wife knew about the 30-day money back guarantee, they kept the phone and service for over a year.
Mr. Chiarella admitted that their experience in the New Orleans area was not typical.
Q. And what about the dropped calls? If it was 7% of dropped calls, was her experience typical?
A. Nationwide? All I know isI mean, all I know is that our experience in the New Orleans area wasn't typical, it was daily, and regular, that we had these problems.
Mrs. Chiarella, who owned a catering business during the relevant time period, testified that she saw some Sprint PCS advertisements in the newspaper and on television and thought it was a good deal. She admitted that her husband did most of the research before purchasing the phone. She stated that she experienced dropped *113 and blocked calls, calls going straight to voicemail, and "echoing." She said that 45%-50% of her calls were blocked and that 40%-50% of her calls were dropped, much higher than the network averages. Despite these problems, she kept her phone and Sprint PCS wireless service for almost two years and purchased a second phone in 1998. Mrs. Chiarella complained to the Sprint Defendants about her service and occasionally received credits on her monthly bill. Despite her difficulties with her service, she used 1,300 to 1,500 minutes per month in 1997.
Jack Jensen testified that he started his Sprint PCS wireless service in late 1997. He did not see any advertisements, but went into a Sprint store when he saw a banner advertising more minutes at a rate lower than what he was then currently paying. He was told that there was or would be service in New Orleans, Baltimore, Minneapolis, and Picayune, Mississippi. Mr. Jensen bought three or four phones for his business. He was not promised that there would not be any dropped or blocked calls.
Mr. Jensen's biggest problem was having calls go directly to his voicemail. While he knew there were areas without service, he did not have problems with blocked calls. Mr. Jensen remained a Sprint PCS wireless subscriber and had twelve active phones at the time of the class hearing.
Mr. Jensen testified that he would have to examine his bills to determine whether a call was dropped. He testified that 20%-30% of his calls were dropped and admitted if only 2% of all calls on the Sprint PCS wireless network in New Orleans were dropped, he was not a typical customer.
Q. If I told you that in 1997, '98 in the New Orleans area, not nationwide but the New Orleans area, less than 2% of the calls made by people were dropped, would you consider yourself to be typical?
A. I would be considered typical if you were picking me up in the 2%; if 2% of mine weren't dropped and thirty-five of the other people were dropped.
Q. Then you would be atypical?
A. I'm not typical.
Q. If I told you that the local statistics for New Orleans in '97, '98 were five, six, 7%, would you think that yours were worse than that?
A. I agree.
Q. So you were worse than all. You would not be typical.
A. If those are the numbers, yes.
* * *
Q. Okay. If the statistics show that the network is busier on the drive time home than it is the rest of the day, and yet you had the same experience earlier in the day, would you, again, think that maybe you're not typical?
A. Untypical. How many other customers have you got in the New Orleans area location using 13,000 minutes a month [in 2004]?
Q. Not very many.
A. So I'm not a typical customer, so that's a fact.
Before considering whether the trial court properly certified the class, we must address an issue concerning the jurisdiction of this court over some of the claims asserted by the plaintiffs. As pointed out by the Sprint Defendants and Retail Defendants in their reply brief, as a wireless telecommunications provider, the Federal Communications Act ("FCA"), 47 U.S.C. §§ 201, et seq., governs many of the rights *114 and obligations of the Sprint Defendants. Section 332(c)(3)(A) of the FCA provides in pertinent part:
No state or local government shall have the authority to regulate the entry of or rates charged by any commercial mobile service.
In a case remarkably similar to the matter before the court, Bastien v. AT & T Wireless Services, Inc., 205 F.3d 983 (7th Cir.2000), the plaintiff sued AT & T Wireless in an Illinois state court alleging that the company misled him about his cellular phone service.
The opinion states:
In 1998, Bastien signed up as an AT & T Wireless customer, although his complaint, filed in state court in Cook County, provided no information regarding the terms and conditions of his service agreement with AT & T Wireless. He quickly became dissatisfied with the quality of service. Because of the insufficient coverage provided by AT & T Wireless's network and also because of the inherent difficulties and unreliability of wireless service generally, many of Bastien's calls were "dropped," that is, cut off in mid-call. Dropped calls occur because of interference to the radio wave carrying the call, such as from tunnels, buildings and the rare Midwestern hill. A more fully developed infrastructure would lose fewer calls because there would be less chance of interference.
Upset about the number of dropped calls, Bastien complained to AT & T Wireless and was told that he could get refunds either automatically by redialing the dropped call within sixty seconds, or by later calling a customer representative and having a credit applied to his bill. Bastien took full advantage of both options, although he often was unable to get the automatic rebate by redialing since a source of interference that interrupts a call may prevent re-connection for longer than sixty seconds. Unhappy that the automatic credit option did not always work, Bastien complained to the FCC, but was told that AT & T Wireless was in full compliance with all FCC rules.
Bastien then filed suit in Illinois state court, alleging that AT & T Wireless breached its contract with him and committed consumer fraud. In the complaint, Bastien alleged that:
9. AT & T Wireless signed up subscribers without first building the cellular towers and other infrastructure necessary to provide reliable cellular connections.
10. As a result, a large proportion of attempts to place calls on AT & T Wireless' system are unsuccessful.
11. AT & T Wireless nevertheless continued marketing and selling its telephones and telephone service, without regard to the fact that it knew that it could not deliver what it was promising.
* * *
23. By signing up subscribers without first building the cellular towers and other infrastructure necessary to accommodate good cellular connections to such subscribers, with the result that a large proportion of attempts to place calls on AT & T Wireless' system are unsuccessful, AT & T Wireless violated:
a. Its contracts; and
b. The implied duty of good faith and fair dealing under such contracts.
* * *
25. AT & T Wireless violated § 2 of the Illinois Consumer Fraud Act, 815 ILCS 505/2 by committing unfair acts or practices as follows:

*115 a. Signing up subscribers without first building the cellular towers and other infrastructure necessary to accommodate good cellular communications to such subscribers, with the result that a large proportion of attempts to place calls on AT & T Wireless' system are unsuccessful;
b. Misrepresenting the quality and benefits of its products and services;
c. Concealing the material facts that it did not have the capacity to handle the volume of its cellular calls; and
d. Failing to have appropriate means for crediting customers for incomplete calls.
26. AT & T Wireless knew that it was signing up subscribers without first building the cellular towers and other infrastructure necessary to handle the call range reasonably expected to be used by such subscribers, and that a large proportion of attempts to place calls on AT & T Wireless' system would be unsuccessful.
AT & T Wireless removed the case to federal court on the ground that Congress had expressly preempted regulation of rates and market entry for mobile phone service in the amendments of the FCA, as set forth above. With this preemption clause in mind, Bastien diligently attempted to state his claim in terms of Illinois state law actions. However, AT & T Wireless contended that Bastien's complaint in fact challenged AT & T Wireless's rates and right to enter the market, two subjects specifically granted to the primary jurisdiction of the FCC. The district court held that jurisdiction over the complaint belonged exclusively to the federal courts.
On appeal, Bastien contended that his complaint properly set out two claims under Illinois lawbreach of contract and consumer fraudthat were distinct from the rates and market entry claims specifically reserved for the FCC. Bastien relied on the "savings clause" found in the FCA, which provided, "Nothing in this chapter contained shall in any way abridge or alter the remedies now existing at common law or by statute, but the provisions of this chapter are in addition to such remedies." 47 U.S.C. § 414. "Courts read the savings clause narrowly to avoid swallowing the rule, but not so narrowly as to render it a dead letter." Bastien, 205 F.3d at 987. Relying on Cahnmann v. Sprint Corp., 133 F.3d 484 (7th Cir.1998), the Bastien court stated:
The [In re Long Distance Telecommunications Litigation, 831 F.2d 627 (6th Cir.1987)] court reasoned that the purpose of the preemption clause to achieve nationwide uniformity in telecommunications regulation was not at issue in a case challenging fraudulent and deceitful statements by the telephone service providers. Id. Because the claims for fraud and deceit would not have affected the federal regulation of the carriers at all, the court held that Congress could not have intended to preempt the claims.
Bastien, 205 F.3d at 988-89.
The Bastien court recognized that before entering a market, a wireless company must obtain approval of its rates and infrastructure arrangements from the Federal Communications Commission ("FCC"), as required by federal law. See 47 C.F.R. § 24.1 et seq. To encourage new market entrants, the FCC allows service providers to begin operations in an area before they have fully built out the network. Bastien, 205 F.3d at 984. The court then examined Bastien's complaint and stated:
We do not need to go so far as to divine the intention of Congress to see that Bastien's complaint directly attacks AT & T Wireless's rates and its right to *116 enter the Chicago market and therefore can be distinguished from the Long Distance Litigation. We merely need to look at the face of the complaint and ask what the nature of the claims are and what the effect of granting the relief requested would be. This shows that, in sharp contrast to the Long Distance Litigation, Bastien's complaint would directly alter the federal regulation of tower construction, location and coverage, quality of service and hence rates for service. In Paragraph 9, Bastien alleges that AT & T Wireless "signed up subscribers without first building the cellular towers and other infrastructure necessary to provide reliable cellular connections." In Paragraph 11, AT & T Wireless "nevertheless continued marketing and selling its telephones and telephone service." In Paragraph 23, AT & T Wireless allegedly "sign[ed] up subscribers without first building the cellular towers and other infrastructure necessary to accommodate good cellular connections." In Paragraph 25(a), AT & T Wireless "sign[ed] up subscribers without first building the cellular towers and other infrastructure necessary to accommodate good cellular connections to such subscribers." In Paragraph 26, AT & T Wireless "knew that it was signing up subscribers without first building the cellular towers and other infrastructure necessary to handle the call range reasonably expected to be used such subscribers."
These claims tread directly on the very areas reserved to the FCC: the modes and conditions under which AT & T Wireless may begin offering service in the Chicago market. The statute makes the FCC responsible for determining the number, placement and operation of the cellular towers and other infrastructure, as well as the rates and conditions that can be offered for the new service. Should the state court vindicate Bastien's claim, the relief granted would necessarily force AT & T Wireless to do more than required by the FCC: to provide more towers, clearer signals or lower rates. The statute specifically insulates these FCC decisions from state court review.
Bastien's complaint contains other allegations sounding more like state law claims. For instance, in Paragraph 9, AT & T Wireless allegedly "knew that it could not deliver what it was promising." In Paragraph 23, AT & T Wireless violated: "a) Its contracts; and b) The implied duty of good faith and fair dealing under such contracts." In Paragraph 25, AT & T Wireless allegedly "b) [m]isrepresented the quality and benefits of its products and services; c) [concealed] the material facts that it did not have the capacity to handle the volume of its cellular calls." While these charges appear more like traditional state law claims, they are all founded on the fact that AT & T Wireless had not built more towers and more fully developed its network at the time Bastien tried to use the system. The reason AT & T Wireless had not more fully developed its network was because it was in compliance with the FCC schedule for building towers and establishing service in the Chicago market. In this complaint, Bastien has repackaged challenges to the FCC-approved plan in a state law wrapper, but the contents of that package remain challenges to the FCC approved plan.
Id. at 989.
As recognized by the FCC in In re Wireless Consumers Alliance, Inc., 15 F.C.C.R. 17,021, 17,035-36, 2000 WL 1140570 (2000):
On the other hand, a case may present a question of whether a CMRS *117 [Commercial Mobile Radio Service] had indeed been provided in accordance with the terms and conditions of a contract or in accordance with the promises included in the CMRS carrier's advertising. Such a case could present breach of contract or false advertising claims appropriately reviewable by a state court. In such a situation, a court need not rule on the reasonableness of the CMRS carrier's charges in order to calculate compensation for the injury that was caused, even though it could be appropriate for it to take the price charged into consideration in calculating damages. In our view, the court would not be making a finding on the reasonableness of the price charged but would be examining whether under state law, there was a difference between promise and performance.
Therefore, we are required to examine the plaintiffs' petitions and the testimony elicited at the certification hearing to determine whether federal law preempts any of the plaintiffs' claims and if others remain for consideration in state court.
The allegations contained in the petitions appear carefully crafted to keep the focus on the Sprint Defendant's marketing and advertising campaign, including the various "representations" made by the Sprint Defendants and Retail Defendants to induce the plaintiffs to purchase a phone sold by the Sprint Defendants and utilize the wireless service sold by the Sprint Defendants.[5] Thus, the plaintiffs have attempted to plead their cause of action to avoid conflict with federal jurisdiction. However, the problems the plaintiffs experienced with the Sprint PCS wireless system were as the result of the Sprint Defendants' entry into the market and the fact that the wireless system did not have the ability and capacity to service all its subscribers. Judging from the time period specified by the class, these problems abated two years after the Sprint Defendants' initial launch in the New Orleans market.
At the certification hearing, the plaintiffs presented the testimony of Carlton P. Tolsdorf, Jr., an expert in the field of wireless communication systems, who stated that the Sprint Defendants switch initially installed in the New Orleans system was inadequate to provide service for the number of wireless subscribers. He testified that shortly after the launch, the switch exceeded its capacity, resulting in dropped and blocked calls and specific geographic areas that had problems, particularly at times of high call volume during the busy hours of the day. This testimony does not address what the plaintiffs were told before they purchased phones and service from the Sprint Defendants and Retail Defendants, but instead focuses on the quality of the wireless service provided by the Sprint Defendants.
In particular, Mr. Tolsdorf opined that the Sprint Defendants' network was not adequately designed to meet the level of subscriber loading, therefore, the capacity was far short of what the original plan and specified capacity was for the Sprint PCS network in New Orleans. This occurred because the original engineering set a need for the New Orleans market of a switch that would have accommodated about 84,000 subscribers. However, the plans were changed due to budgetary constraints and management direction in how the New Orleans market build-out and rollout of the capacity would actually occur. Consequently, he testified that the switch was under capacity and was operating at 185% over its original design.
*118 We find that these issues of technical difficulties experienced by the system, separate and apart from any representations by a defendant, relate to the Sprint Defendants' rates and entry into the market. The Sprint Defendants do not dispute that the system performed less than flawlessly. Accordingly, the FCA, as discussed in Bastien, preempts these matters. Thus, the only issue that can be adjudicated in state court is whether the Sprint Defendants and Retail Defendants made certain misrepresentations to the plaintiffs on which they relied before purchasing a phone and wireless service from the Sprint Defendants.
The purpose and intent of the class action is to "adjudicate and obtain res judicata effect on all common issues applicable not only to the representatives who bring the action, but to all others who are similarly situated." Ford v. Murphy Oil U.S.A., Inc., 96-2913, p. 4 (La.9/9/97), 703 So.2d 542, 544; Banks v. New York Life Insurance Co., 98-0551, p. 2 (La.12/7/98), 722 So.2d 990, cert. denied, 528 U.S. 1158, 120 S.Ct. 1168, 145 L.Ed.2d 1078 (2000); Andry v. Murphy Oil, U.S.A., Inc., 97-0793, p. 3 (La.App. 4 Cir. 4/1/98), 710 So.2d 1126, 1129, writs denied, 98-1158, 98-1178, 98-1204 (La.6/19/98), 720 So.2d 1213, 1214. Louisiana courts are generally given vast discretion to determine whether or not to certify a class. The trial court's decision therefore must not be reversed absent manifest error. Royal Street Grocery, Inc. v. Entergy New Orleans, Inc., 99-3089, 99-3090 (La.App. 4 Cir. 1/10/01), 778 So.2d 679, writ denied, 01-0374 (La.4/12/01), 789 So.2d 594.
Louisiana Code of Civil Procedure Articles 591-597 govern the class action procedure. Article 591 A provides the general rule for certification of a class. One or more members of a class may sue or be sued as representative parties on behalf of all, only if:
(1) The class is so numerous that joinder of all members is impracticable;
(2) There are questions of law or fact common to the class;
(3) The claims or defenses of the representative parties are typical of the claims or defenses of the class;
(4) The representative parties will fairly and adequately protect the interests of the class; and
(5) The class is or may be defined objectively in terms of ascertainable criteria, such that the court may determine the constituency of the class for purposes of the conclusiveness of any judgment that may be rendered in the case.
In addition, La. C.C.P. art. 591 provides in pertinent part:
B. An action may be maintained as a class action only if all of the prerequisites of Paragraph A of this Article are satisfied, and in addition:
(1) The prosecution of separate actions by or against individual members of the class would create a risk of:
(a) Inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class, or
(b) Adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests; or
(2) The party opposing the class has acted or refused to act on grounds *119 generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; or
(3) The court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to these findings include:
(a) The interest of the members of the class in individually controlling the prosecution or defense of separate actions;
(b) The extent and nature of any litigation concerning the controversy already commenced by or against members of the class;
(c) The desirability or undesirability of concentrating the litigation in the particular forum;
(d) The difficulties likely to be encountered in the management of a class action;
(e) The practical ability of individual class members to pursue their claims without class certification;
(f) The extent to which the relief plausibly demanded on behalf of or against the class, including the vindication of such public policies or legal rights as may be implicated, justifies the costs and burdens of class litigation; or
(4) The parties to a settlement request certification under Subparagraph B(3) for purposes of settlement, even though the requirements of Sub-paragraph B(3) might not otherwise be met.
C. Certification shall not be for the purpose of adjudicating claims or defenses dependent for their resolution on proof individual to a member of the class. However, following certification, the court shall retain jurisdiction over claims or defenses dependent for their resolution on proof individual to a member of the class.
Based upon these tests, we determine whether the case before us may proceed as a class action.
We find several problems with the trial court's certification of the instant class. First, we find that the trial court erred in finding that the plaintiffs satisfied the numerosity requirement for class actions.
As stated by this court in Cooper v. City of New Orleans, 01-0115, p. 4 (La.App. 4 Cir. 2/14/01), 780 So.2d 1158, 1160, writ denied, 01-0720 (La.5/11/01), 792 So.2d 734:
Concerning numerosity, no set number has been established that automatically makes joinder impracticable; rather the determination is based on the facts and circumstances of each case. Dumas v. Angus Chemical Co., 25,632 (La.App. 2 Cir. 3/30/94), 635 So.2d 446, 450. Although identification of all potential class members is not necessary, the party seeking certification should establish a definable group of aggrieved claimants. Farlough v. Smallwood, 524 So.2d 201, 203 (La.App. 4th Cir.), writ denied, 526 So.2d 810 (La.1988). Conclusory allegations do not carry the plaintiff's burden to establish numerosity. Lewis v. Roemer, 94-0317 (La. App. 4 Cir. 9/29/94), 643 So.2d 819, 822. [Emphasis added.]
The parties agreed that there were approximately 60,000 Sprint PCS wireless subscribers during the class period. Mr. Tolsdorf testified that, based on the Sprint *120 Defendants' answers to discovery propounded by the plaintiffs, there were 14,000 subscribers at the end of 1997; 37,700 at the end of 1998; and 61,000 at the end of 1999. He stated that all the subscribers would be equally affected by blocked calls in the system and would have experienced excessive dropped calls.
Based on the evidence in the record, however, a court cannot assume that all of the Sprint PCS wireless subscribers were unhappy with their service. Frederick Fortuna, Director of Core Engineering for Sprint Communications Service, testified that because wireless communications involve sending signals through the atmosphere using radio waves, wireless users can experience blocked or dropped calls. While all carriers, including the Sprint Defendants, strive to minimize blocked and dropped calls, some are inevitable given the inherent nature of wireless technology. Mr. Fortuna testified that the FCC does not regulate blocked and dropped call levels; the FCC leaves it up to the market to define acceptable levels.
During the class period, the Sprint Defendants averaged 5.27% blocked and 2.06% dropped calls in the New Orleans area.[6] Because these figures are averages, some subscribers would experience a higher percentage while others would experience a lower percentage. Thus, those subscribers with lower incidence of blocked and dropped calls would not necessarily be unhappy Sprint PCS wireless customers.
As noted above, the plaintiffs must demonstrate with evidence a definable group of aggrieved claimants, which they did not do at the certification hearing. Thus, we find that the trial court erred in finding that the class met the numerosity requirement for class certification.
We next examine the trial court's finding that issues of law and fact common to the members of the class predominate over questions affecting only individual class members. According to the pleadings, the plaintiffs have alleged that the Sprint Defendants represented that they would provide wireless service in New Orleans, the plaintiffs reasonably relied on that promise, the Sprint Defendants did not live up to that promise, and the plaintiffs were damaged as a result.
In Stevens v. Board of Trustees of Police Pension Fund of City of Shreveport, 309 So.2d 144, 151 (La.1975), the Supreme Court noted that the existence of a common question of law or fact does not by itself justify a class action. The requirement of a "common character" restricts the class action to those cases in which it would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated without sacrificing procedural fairness or bringing about other undesired results. See also Johnson v. Orleans Parish School Bd., 00-0825, p. 12 (La.App. 4 Cir. 6/27/01), 790 So.2d 734, 743, writs denied, 01-2216, 01-2225, 01-2215 (La.11/9/01), 801 So.2d 378, 379. Therefore, if the superiority of a class action is disputed, the trial court must inquire into the aspects of the case and decide whether some other procedural device would better serve the intertwined goals of effectuating substantive law, judicial efficiency, and individual fairness. Id. at p. 13, 790 So.2d at 744. In determining whether a class action in a particular case will promote enforcement of legislative policy, fairness, and efficiency, the trial court must actively *121 inquire into every aspect of the case and should not hesitate to require showings beyond the pleadings. Id. at p. 14, 744 So.2d at 744, citing Stevens, 309 So.2d at 152.
In Banks v. New York Life Insurance Co., 98-0551 (La.7/2/99), 737 So.2d 1275, cert. denied, 528 U.S. 1158, 120 S.Ct. 1168, 145 L.Ed.2d 1078 (2000), the plaintiffs sued for fraud and misrepresentation in connection with the sales of insurance policies. The facts indicate that:
The home office trained New York Life agents and marketing materials came from the home office. During the class period, illustrations such as charts and explanatory brochures were available to assist agents in the sales presentations. New York Life alleges that explanatory materials stated that dividends were not guaranteed, and by 1987, software automatically placed on every page of an illustration a notice stating that dividends and cash values were not guaranteed. Sales presentations were individualized. Each agent developed a different relationship with each policyholder. Some policies were sold after numerous conversations and lengthy meetings while others were sold after group presentations at work sites and with very little interaction with premiums being paid through voluntary payroll deductions. Each agent had his or her own method of marketing and selling insurance policies. The record further reveals a diverse group of representative plaintiffs, with varying levels of sophistication and experience that purchased life insurance policies in different years from different New York Life agents in different sales situations.
Id. at p. 4, 737 So.2d at 1278.
The Court examined federal cases construing Federal Rule 23,[7] recognizing the essence of the plaintiffs' claims were fraud and negligent misrepresentation causes of action by New York Life and its agents.
First, we recognize the essence of plaintiffs' claims are fraud and negligent misrepresentation causes of action committed by New York Life and its agents. In Young v. Ray Brandt Dodge, Inc., 176 F.R.D. 230 (E.D.La.1997), plaintiffs brought suit for certification of a class of Louisiana automobile buyers who purchased and financed liability insurance from defendants. In denying certification the court reasoned that because the underlying claims are based on fraud, a reliance of each aggrieved person as to each credit purchase must be shown. A fraud class action cannot be certified when individual reliance will be an issue. Castano v. Am. Tobacco Co., 84 F.3d 734, 745 (5th Cir.1996); Kirkham v. Am. Liberty Life Ins. Co., 30,830 (La.App. 2nd Cir.8/19/98); 717 So.2d 1226, 1229, *122 (quoting Simon v. Merrill Lynch, 482 F.2d 880, 882 (5th Cir.1973))(if there is any material variation in the representation made or in the degree of reliance thereupon, a fraud case may be unsuited for treatment as a class action). In determining whether fraudulent or negligent misrepresentations have occurred, the circumstances surrounding each purchase by each policyholder must be examined to determine whether the purchaser relied on representations made either in written documents or by a particular agent and if so, whether the representations affected the circumstances of each sale.
Id. at p. 9, 737 So.2d at 1281.
The Court ultimately concluded that to decide whether fraudulent or negligent misrepresentations had occurred, "the trial court would be required to scrutinize each plaintiff's case individually to determine if the oral representations were at odds with the written disclosures and analyze whether the plaintiffs relied upon oral statements, written materials or both." Id. at p. 10, 737 So.2d at 1281-82.
In the instant matter, phones and service were sold in the Sprint Defendants' stores, by telephone through a toll-free number, and on the Sprint Defendants' web site. In addition, independent distributors, including twenty-nine Radio Shack stores, five Campo Electronics stores, three Circuit City stores, Cox Communications, Dillard's Department Store, Mobile-One Auto Sound, Office Depot, and the Sharper Image, sold phones and Sprint PCS wireless services. Consequently, each plaintiff would have to be questioned as to what he/she was told and/or shown when making the decision to purchase a phone. For example, Mr. Gibson purchased a phone even after friends told him that the service was not very good and could not be used in some places. Therefore, it cannot be said that every member of the proposed class was "misled" by the person making the sale.
The evidence in the record demonstrates that the Sprint Defendants' radio, television, newspaper, and other print advertising during the class period focused on several key marketing messages: 100% digital clarity and less background noise, first incoming minute free, no contract required, privacy, and security. The Sprint Defendants' advertising also emphasized inexpensive rate plans, low-cost phones, and various promotions, including rebates on phones, and free local calls on Monday nights.
Some of the "misrepresentations" to the plaintiffs were allegedly displayed in the coverage maps[8] and through oral statements by the individual sales personnel both in person and on the phone as to the coverage areas in service. Of the five witnesses who testified for the plaintiffs, only two said that they saw or probably saw a Sprint coverage map before signing up with Sprint. Mrs. Gibson testified that she was told that there was coverage between New Orleans and Baton Rouge. Mr. Gibson did not see any advertisements and was told there was coverage on I-10 towards Tallahassee, even though a coverage map showed him otherwise. Mr. Jensen was told that there was coverage in New Orleans, Baltimore, and Minneapolis, *123 and Picayune. Mr. Chiarella testified that he was told there was coverage throughout area code 504. Mrs. Chiarella was not told anything; her husband did all the research. No testimony exists in the record whereby the plaintiffs were told anything about blocked or dropped calls.
In addition to proving that alleged misrepresentations were made, each person asserting a claim for fraud and negligent misinformation must prove that he/ she justifiably relied on the alleged misrepresentations.[9]Abbott v. Equity Group, Inc., 2 F.3d 613 (5th Cir.1993), cert. denied, 510 U.S. 1177, 114 S.Ct. 1219, 127 L.Ed.2d 565 ("[t]o prevail [on negligent misrepresentation], Louisiana requires proof of actual reliance.") In Guidry v. United States Tobacco Co., 188 F.3d 619, 627 (5th Cir.1999), Judge James Dennis, writing for the United States Fifth Circuit, held that fraud can give rise to both contract and tortious causes of action and listed the elements of a cause of action in fraud as follows: "(a) a misrepresentation of a material fact, (b) made with the intent to deceive, and (c) causing justifiable reliance with resultant injury."
Based on the record before us, we find that reliance issues defeat predominance on claims of fraud and misrepresentation. This is because the trial court will be required to analyze whether each plaintiff justifiably relied upon what he/she was told and/or saw before deciding to purchase Sprint PCS wireless service.
Finally, the plaintiffs have not proven a class-wide injury or damage caused by the alleged misrepresentations. All that was proven at the hearing is that the plaintiffs who testified experienced blocked and/or dropped calls that far exceeded the New Orleans network average during the relevant time period. Further, it was proven at the certification hearing that in order to prove damages, someone would have to manually examine more than one million monthly bills containing more than 100 million calls, guessing which ones were dropped and reconnected. Once that calculation is done, the Sprint Defendants presented evidence that in order to determine damages, one would have to work through a multi-layered flow chart analysis that would take possibly years to complete.
Dan Clark, Director of Project Management for Sprint Communications Service, testified that during the class period, most Sprint PCS wireless customers subscribed to a "rate plan" that provided a stated number of minutes for a stated price. There were many different rate plans during the class period. If a subscriber used more minutes that his plan provided, he would be charged a per-minute "overage" rate, which varied on the market and when the subscriber started his service.
Mr. Clark testified that blocked calls cannot cost a subscriber any money because they are not counted against a caller's monthly bundle of minutes. Whether or not a dropped call costs a subscriber any money requires a complex calculation including at least the following steps: (1) review the monthly bill to see if there are any calls that might have been dropped and reconnected; (2) determine the actual length of the two calls to see if the calls round up to an extra minute; (3) determine if the first call was incoming to the Sprint PCS wireless subscriber or outgoing *124 from the subscriber; (4) determine who reconnected the call; (5) determine if the total of the two calls lasted after rounding, one minute longer than a single call would have lasted; (6) determine if the subscriber exceeded his bundle of monthly minutes; and (7) determine if the subscriber received any credits from the Sprint Defendants for dropped calls. Mr. Clark testified that the Sprint Defendants have no ability to make these determinations automatically or electronically; instead, this would require a physical examination of 1,440,000 bills, each containing an average of 200 calls.
The court appreciates the plaintiffs' argument that individual questions of quantum of damages does not in and of itself defeat certification. See Mayho v. Amoco Pipeline Co., 99-620 (La.App. 5 Cir. 12/15/99), 750 So.2d 278, writ denied, 00-0110 (La.3/17/00), 756 So.2d 1143. However, "when individualized questions of causation and injury predominate over common issues then class certification is inappropriate." Banks, 98-0551 at p. 11, 737 So.2d at 1282.
Proof of causation and injury-in-fact in the instant case would be complex and individualized. Not all the plaintiffs have the same concerns. For example, while most complained of a high number of dropped calls, Mr. Jensen testified that dropped calls were not a problem for him. In addition, there was little testimony regarding actual injuries sustained by the plaintiffs or that injuries were sustained on a class-wide basis. In fact, we find that causation and injury-in-fact will be difficult if not impossible to prove on a class-wide basis since each member of the class must prove the alleged fraud or misrepresentation and the amount of damages, if any, sustained by him or her. Due to the wide disparity of problems allegedly suffered by each plaintiff, a judgment for one plaintiff would have very little effect on the outcome of another suit.
Finally, we find that the trial court erred in finding that the claims of the representatives are typical of the claims of the defined class.
The element of typicality requires that the claims of the class representatives be a cross-section of, or typical of, the claims of all class members. Andry v. Murphy Oil, U.S.A., Inc., 97-0793, p. 5 (La.App. 4 Cir. 4/1/98), 710 So.2d 1126, 1129. Louisiana jurisprudence does not require a "Noah-like" tabulation of class representatives and claims. Johnson v. Orleans Parish School Bd., 00-0825, 00-0826, 00-0827, 00-0828, p. 10 (La.App. 4 Cir. 6/27/01), 790 So.2d 734, 742. The plaintiffs are not required to produce two, or even one, of every kind of claim or of every person included in the class. The law only requires that the plaintiffs "typically" and "adequately" demonstrate that they represent a cross-section of the claims asserted on behalf of the class. Johnson, 00-0825, p. 10, 790 So.2d at 742; Andry, 97-0793 at p. 6, 710 So.2d at 1131.
The Sprint Defendants presented uncontroverted evidence that during the relevant time period, the system overall was experiencing 2%-3% dropped calls and 5%-9% blocked calls. The five proposed representative parties who testified at the certification hearing reported dropped and blocked calls approaching 50%. Three of the class representatives admitted that their experience was not "typical." These five individuals had jobs/careers that frequently placed them in their automobiles driving around and outside the New Orleans area. No evidence exists that other proposed class members had similar experiences. In fact, the class as defined includes every purchaser of phones sold by the Sprint Defendants, Retail *125 Defendants, and/or Sprint PCS wireless services, not just those unhappy with the service provided by the Sprint PCS wireless system.
Further, the plaintiffs who testified claim that certain misrepresentations were made to them by Sprint. However, the petitions allege that other class representatives purchased their phones from other entities, such as Radio Shack and Cox Communications. The record does not reflect if what they were told differed from the testimony presented.
As stated by the Court in Banks:
In sum, we conclude that there are too many individual issues affecting New York Life's and its agents' liability in this case to find that common issues predominate. As stated in In Re Ford Motor Co. Vehicle Paint Litig., 182 F.R.D. 214, 220 (E.D.La.1998), "[w]hen defendant's conduct means different things for different class members, trying the issue of its liability for that conduct on an aggregated basis is problematic." Moreover, we conclude that a class action would not be superior to other procedural methods in this case when we balance in terms of fairness and judicial efficiency the merits of a class action against alternative procedural methods. Plaintiffs argue that many claims are small and they are without the means to pursue their claims on an individual basis; therefore, fairness dictates that we certify this class. While we realize the expense to class members in having to pursue their claims in individual lawsuits, nevertheless, we cannot find a class action which would result in a multitude of mini-trials to be superior under the circumstances of this case.
98-0551 at pp. 12-13, 737 So.2d at 1283.
Based on the foregoing, we find that the trial court abused its discretion in granting certification in this matter. Therefore, we reverse the judgment of the trial court. Because we reverse and set aside the judgment, we pretermit discussion of whether the class as certified was overly broad.
REVERSED AND RENDERED.
ARMSTRONG, C.J., Concurring.
MURRAY, J., Concurring with Reasons.
ARMSTRONG, C.J., concurring.
I respectfully concur. Individual issues predominate over those of the purported class. The would-be class representatives failed to show that their claims were typical of any substantial number of potential claimants. The claims should proceed individually, or, where appropriate, they should proceed pursuant to the rules governing the cumulation of actions pursuant to La. C.C.P. art. 461, et seq.
MURRAY, J., Concurring with Reasons.
Although I agree with the holding that the trial court erred in certifying the class, I write separately to explain the reasons I would find the requirements for certification are not met.
First, the correctness of the certification decision in this case does not turn on the four basic certification requirements in La. C.C.P. art. 591(A)numerosity, commonality, typicality, and adequacy of representation. Rather, it turns on the two requirements set forth in La. C.C.P. art. 591 B(3)predominance and superiority.[1]
*126 As to the predominance requirement, "[t]he initial, and perhaps the most important, inquiry is whether the issue of liability by or to all members of the class arises out of a common nucleus of operative fact." 1 Frank L. Maraist and Harry T. Lemmon, Louisiana Civil Law Treatise: Civil Procedure § 4.12 (1999). If the purported common issues are required to be adjudicated on an individualized basis, then the common issues do not predominate. 2 Alba Conte and Herbert Newberg, Newberg on Class Actions § 4:26 (4th ed.2002).
In this case, the plaintiffs' theory of liability is based on alleged misrepresentations and fraud. A fraud case generally is unsuited for class certification if there are any material variations in the representations made or the reliance thereon. See Banks v. New York Life Ins. Co., 98-0551, p. 10 (La.7/2/99), 737 So.2d 1275, 1281. Indeed, class certification is generally inappropriate when issues of reliance are involved. Bradberry v. John Hancock Mutual Life Ins. Co., 222 F.R.D. 568 (W.D.Tenn.2004); 2 Alba Conte and Herbert Newberg, Newberg on Class Actions § 4:26 (4th ed. 2005 Supp.)(discussing Bradberry). This is true not only for insurance sales cases, but also for other cases involving fraud claims. Bradberry, 222 F.R.D. at 571-72. Explaining the reason why certification in these types of cases generally is improper, the court in Bradberry stated:
"[C]lass certification is improper because plaintiffs will need to submit proof of the statements made to each plaintiff, the nature of the varying material misrepresentations, and the reliance of each plaintiff upon those misrepresentations in order to sustain their claims. As these are questions that more than likely will be the central disputed issues in a fraud action, certification of the class will not negate the need for a series of mini-trials where there are material variations in the nature of the misrepresentations made."
Bradberry, 222 F.R.D. at 572 (quoting Moore v. PaineWebber, Inc., 306 F.3d 1247, 1253 (2d Cir.2002)). Such is the case here.
As defendants contend, there is no class-wide misrepresentation alleged, no uniform source of information that was provided to the plaintiffs, no uniform class-wide contract, and no class-wide proof of injury. The trial court will be required to make individualized determinations, which will result in a separate mini trial for each class member. Under these circumstances, the trial court erred in finding the predominance requirement satisfied. It is axiomatic, as defendants point out, that because a class action would "result in a multitude of mini-trials," a class action would not be a superior method of resolving this dispute. See Banks, 98-0551 at p. 13, 737 So.2d at 1283. The trial court thus erred in finding the superiority requirement satisfied.
Given neither of the requirements under La. C.C.P. art. 591 B(3) is satisfied, the trial court erred in certifying the class.
For these reasons, I respectfully concur.
NOTES
[1] The plaintiffs allege that Sprint Communications Service Company LP is in a joint venture with Cox Communications Company, Tele-Communications, Inc., and Comcast Corporation.
[2] The certification of a class is an interlocutory judgment. However, where irreparable injury may result, the judgment is appealable. La. C.C.P. art. 2083.
[3] The plaintiffs agree that the class, as defined by the trial court, is too broad and ask that the class be amended to include only those individuals in the greater New Orleans area from May 1997 and for a two-year period thereafter. Because we find that the trial court erred in certifying the class, we pretermit discussion of this issue.
[4] A "blocked" call occurs when the subscriber is unable to place a call, whereas a "dropped" call is one that disconnects in the middle of a phone call.
[5] Of course, these allegations have problems of their own, which will be discussed infra.
[6] Both Mr. Tolsdorf and Mr. Fortuna agreed that an average of 2% dropped calls was acceptable.
[7] La. C.C.P. arts. 591-597 were modeled after Federal Rule 23 as originally enacted. After the amendment of Rule 23 in 1966, Louisiana courts have used the factors set forth in Rule 23(b) as guidelines to determine whether to allow a class action. Stevens, supra, 309 So.2d at 150-51. In Ford v. Murphy Oil U.S.A., Inc., 96-2913, 96-2917, 96-2929 (La.9/9/97), 703 So.2d 542, the Supreme Court directed Louisiana courts to be guided by the standards for class certification set forth in Rule 23(b). Rule 23(b)(3) provides that the court must find that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. To determine whether common issues predominate, a crucial question is whether the case would be manageable as a class action. The trial judge is given wide discretion in determining whether to allow class actions using the factors listed in Rule 23(b) and the "fairness" factors enunciated in Stevens. Banks, 98-0551 at pp. 7-8, 737 So.2d at 1280, citing Ford, at p. 9, 703 So.2d at 547-48.
[8] As demonstrated at the hearing, the coverage maps carried a disclaimer that read: "The Sprint PCS service maps are based on computer-generated radio frequency coverage prediction. Planned service areas and anticipated expansion in service may be subject to alterations due to changes in transmitter locations. While we endeavor to make maps as accurate as possible as of the date of publication, the information provided is not a guarantee of service availability."
[9] According to La. C.C. art. 1953, "fraud is a misrepresentation or a suppression of the truth made with the intention either to obtain an unjust advantage for one party or to cause a loss or inconvenience to the other party. Fraud may result from silence or inaction." The plaintiffs did not introduce any evidence into the record to support a finding that the Sprint Defendants had an intention to defraud its customers.
[1] Article 591 B(3) provides: "[t]he court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy."