924 So.2d 1245 (2006)
Brandi HOWARD, et al., Plaintiffs-Appellants
v.
WILLIS-KNIGHTON MEDICAL CENTER, Defendant-Appellant.
No. 40,634-CA.
Court of Appeal of Louisiana, Second Circuit.
March 8, 2006.
*1248 Peters, Ward, Bright & Hennessy, by J. Patrick Hennessy, Alan Stegall, Shreveport, Simon, Fitzgerald, Cooke, Reed & Welch, by Keith M. Welch, Shreveport, for Plaintiffs-Appellants Brandi Howard, Donna Atkins, Bessie Tyler and Tana Ashcraft.
Pugh, Pugh & Pugh, L.L.P., by Lamar P. Pugh, Shreveport, Fulbright & Jaworski, L.L.P., by R. Jeffrey Layne, Marcy Hogan Greer, Health One, by James F. Beatty, Jr., for Defendant-Appellant Willis-Knighton Med. Center.
Adams and Reese, LLP, by Gregory D. Frost, Baton Rouge, for Amicus Curiae.
Before WILLIAMS, STEWART and MOORE, JJ.
MOORE, J.
This appeal arises from an interlocutory order in a class action certification proceeding in which the trial court certified two of four subclasses the plaintiffs sought to certify as members of a more broadly defined class of all patients whom Willis-Knighton Medical Center ("WKMC") provided medical treatment for injuries caused by the fault of a third party tortfeasor and filed statutory liens on any judgment or settlement proceeds to which these patients might be entitled. Plaintiffs contend that the standard rates of medical charges are unreasonable. Both sides have appealed: the plaintiffs appeal the denial of certification of two of the subclasses of "uninsured patients," and the defendant appeals the grant of certification of the two subclasses of "insured patients." We affirm.

Facts
The plaintiffs filed this action in January of 2001 alleging improper and illegal billing practices by WKMC.[1] Plaintiffs sought *1249 class certification of the action alleging that they are the victims of WKMC's unreasonable charges and collection processes that utilize Louisiana's hospital lien statute, La. R.S. 9:4752 ("Lien Statute"). The unifying connection among class members is that each class member received medical treatment at WKMC for injuries in an accident caused by the fault of a third party and WKMC placed liens against any judgment or settlement proceeds available to the class member from third-party insurers to obtain payment of the treatment charges. Unlike the theories of recovery in the federal cases noted above,[2] the plaintiffs' theory of recovery appears to be based on an alleged violation of R.S. 9:4752, which gives hospitals "a privilege for reasonable charges or fees on the net amount payable by judgment or settlement by the tortfeasor or his insurer to an injured party, his heirs, or legal representatives." (Emphasis ours). Both the insured and uninsured plaintiffs allege that the hospital's undiscounted rates for medical treatment generated from their "chargemaster"[3] are not reasonable. The putative subclasses of medically insured plaintiffs allege that WKMC wrongly charged them the full chargemaster rates instead of discounted charges pursuant to their health insurance with insurers who have contractual agreements with WKMC that provide for discounted charges. The putative subclasses of uninsured patients simply contend that the chargemaster rates are unreasonable.
Hence, the plaintiffs were initially divided into two groups: those who had medical insurance and those who were uninsured when they were treated at WKMC for injuries caused by the fault of a third party. These two groups are each further subdivided into two groups: those who paid their charges in full by virtue of the Lien Statute, and those for whom charges are still pending and subject to liens. The results of these subdivisions are the following four subclasses of plaintiffs who seek the following relief:
(1) First Subclass: Uninsured individuals who paid all WKMC charges by virtue of the Lien Statute. The members of this class seek a judgment awarding an amount equal to the difference between the reasonable charges for services rendered and what they actually paid, plus legal interest.
(2) Second Subclass: Uninsured individuals who have received demands from WKMC through the Lien Statute but have not yet paid. The members of this class seek a judgment declaring the reasonable *1250 charges or fees due to WKMC and limiting WKMC's recovery to same, and enjoining WKMC from continuing its current collection practice.
(3) Third Subclass: Insured individuals who paid WKMC through the Lien Statute and the charges were greater than the reimbursed amount authorized by their health insurer. The members of this class seek a judgment awarding the total amount collected by WKMC plus legal interest.
(4) Fourth Subclass: Insured individuals who received demands from WKMC through the Lien Statute for more than the reimbursement amount of their health insurers but have not yet paid. The members of this class seek a judgment declaring that WKMC violated the Lien Statute by not billing the injured parties' health insurers, and enjoining WKMC from continuing that practice.
WKMC opposed the plaintiffs' motion for certification of the four subclasses. After an evidentiary hearing, the trial court denied certification of the first and second classthe two uninsured groupson grounds that the defendant offered uncontroverted evidence that the charges reflected on WKMC's chargemaster are reasonable, and further concluded that it is a "novel and untested theory" that a court should determine what constitutes reasonable charges rather than market forces or the legislature.
The court certified the third and fourth subclasses, finding that the members of these classes were covered by health insurance, and therefore, provider agreements. These agreements provide that they will pay less than 100% of the chargemaster rate, and yet the members were charged and billed 100% of the chargemaster rate and collection was made or attempted through the Lien Statute. The common question, the court concluded, is whether the Lien Statute allows WKMC to bill and collect chargemaster rates instead of the lower provider agreement rates.
The court stated that the evidence showed that the class of insureds is so numerous that joinder is impractical, the issue is common to the class, and the claims of the representatives appointed are typical of the claims of the class. Further, the class is defined objectively in terms of ascertainable criteria such that determining its constituency is not problematic.
The court also found that prosecution of separate actions would create a risk of inconsistent adjudications. Finally, it found that the class action is superior to any other available method for the fair and efficient adjudication of the controversy. It appointed plaintiffs Donna Atkins and Bessie Tyler to serve as class representatives.
Both sides appealed those certification rulings that they opposed.

Discussion
Under Louisiana law, in order to meet class certification requirements, plaintiffs must meet all of the requirements of La. C.C.P. art. 591(A) and fall within one of the subsections of 591(B). Defraites v. State Farm Mut. Auto. Ins. Co., 03-1081 (La.App. 5 Cir. 1/27/04), 864 So.2d 254, writ denied, XXXX-XXXX (La.8/12/01), 869 So.2d 832; Edmonds v. City of Shreveport, 39,893 (La.App. 2 Cir. 8/31/05), 910 So.2d 1005. Article 591 states in pertinent part:
A. One or more members of a class may sue or be sued as representative parties on behalf of all, only if:
(1) The class is so numerous that joinder of all members is impracticable.
(2) There are questions of law or fact common to the class.
(3) The claims or defenses of the representative parties are typical of the claims or defenses of the class.

*1251 (4) The representative parties will fairly and adequately protect the interests of the class.
(5) The class is or may be defined objectively in terms of ascertainable criteria, such that the court may determine the constituency of the class for purposes of the conclusiveness of any judgment that may be rendered in the case.
B. An action may be maintained as a class action only if all of the prerequisites of Paragraph A of this Article are satisfied, and in addition:
(1) The prosecution of separate actions by or against individual members of the class would create a risk of:
(a) Inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class, or
(b) Adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests; or
(2) The party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; or
(3) The court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to these findings include:
(a) The interest of the members of the class in individually controlling the prosecution or defense of separate actions;
(b) The extent and nature of any litigation concerning the controversy already commenced by or against members of the class;
(c) The desirability or undesirability of concentrating the litigation in the particular forum;
(d) The difficulties likely to be encountered in the management of a class action;
(e) The practical ability of individual class members to pursue their claims without class certification;
(f) The extent to which the relief plausibly demanded on behalf of or against the class, including the vindication of such public policies or legal rights as may be implicated, justifies the costs and burdens of class litigation; or
(4) The parties to a settlement request certification under Subparagraph B(3) for purposes of settlement, even though the requirements of Subparagraph B(3) might not otherwise be met.
C. Certification shall not be for the purpose of adjudicating claims or defenses dependent for their resolution on proof individual to a member of the class. However, following certification, the court shall retain jurisdiction over claims or defenses dependent for their resolution on proof individual to a member of the class.
The burden of establishing that the statutory criteria is met falls on the party seeking to maintain the class action. Cooper v. City of New Orleans, 01-115 (La.App. 4 Cir. 2/14/01), 780 So.2d 1158, writ denied, 01-720 (La.5/11/01), 792 So.2d 734; Billieson v. City of New Orleans, 98-1232 (La.App. 4 Cir. 3/3/99), 729 So.2d 146, 154, writ denied, 00-946 (La.10/29/99), 749 So.2d 644 and writ denied, 99-960 (La.10/29/99), 749 So.2d 645. A trial court has wide discretion in deciding whether to *1252 certify a class and the decision will not be overturned absent a finding of manifest error or abuse of discretion. Defraites, supra; Adams v. CSX Railroads, 92-1077 (La.App. 4 Cir. 2/26/93), 615 So.2d 476. However, any errors to be made in deciding class action issues should be in favor of and not against the maintenance of the class action, because a class certification order is subject to modification, if later developments during the course of the trial so require. McCastle v. Rollins Environmental Services of Louisiana, Inc., 456 So.2d 612 (La.1984); Johnson v. E.I. Dupont deNemours and Co., 98-229 (La.App. 5 Cir. 10/14/98), 721 So.2d 41.
The purpose and intent of a class action procedure is to adjudicate and obtain res judicata effect on all common issues applicable not only to the class representatives who bring the action, but to all others who are similarly situated, provided they are given adequate notice of the pending class action and do not timely exercise their option of exclusion. Defraites, supra; Doerr v. Mobil Oil Corp., 01-775 (La.App. 4 Cir. 2/27/02), 811 So.2d 1135, 1141, writ denied, 02-920 (La.5/31/02), 817 So.2d 105 and writ denied, 02-938 (La.5/31/02), 817 So.2d 106. The interests of justice are not served by the needless time-consuming repetition of evidence and litigation of issues in individual trials on a one-by-one basis which are common to the claims of all affected. 5 Newberg on Class Actions, § 17:1 at p. 298 (4th Ed.2002).
Because Louisiana Code of Civil Procedure Article 591 closely parallels Federal Rule 23 regarding class actions, our analysis is informed by federal jurisprudence interpreting Rule 23. See Ford v. Murphy Oil U.S.A., Inc., 96-2913 (La.9/9/97), 703 So.2d 542.

The Plaintiffs' Cause(s) of Action
Determination of the suitability of a claim for class action certification demands an understanding of the factual and legal issues that will arise from the plaintiffs cause(s) of action. "Going beyond the pleadings is necessary, as a court must understand the claims, defenses, relevant facts, and applicable substantive law in order to make a meaningful determination of the certification issues." Castano v. Am. Tobacco Co., 84 F.3d 734, 744 (5th Cir.1996); see also, Kent A. Lambert, "Certification of Class Actions in Louisiana," 58 La. L.Rev. 1085 (1998). In this case, the plaintiffs' theory of recovery or cause of action is not expressly stated, but clearly the plaintiffs' complaints against WKMC are based on the provisions in the hospital lien statute that gives hospitals and other health care providers a privilege for their "reasonable charges or fees" on a judgment, settlement, or compromise and on insurance proceeds payable to the injured person. In its entirety, La. R.S. 9:4752, reads:
A health care provider, hospital, or ambulance service that furnishes services or supplies to any injured person shall have a privilege for the reasonable charges or fees of such health care provider, hospital, or ambulance service on the net amount payable to the injured person, his heirs, or legal representatives, out of the total amount of any recovery or sum had, collected, or to be collected, whether by judgment or by settlement or compromise, from another person on account of such injuries, and on the net amount payable by any insurance company under any contract providing for indemnity or compensation to the injured person. The privilege of an attorney shall have precedence over the privilege created under this Section. (Emphasis added).
*1253 Virtually all the states, including the District of Columbia, have similar lien statutes enacted by their respective legislatures in an attempt to lessen the burden imposed on hospitals by non-paying accident cases. 16 A.L.R.5th 262, 285, § 2. Similarly, Louisiana's privilege or lien may be asserted by a health care provider for reasonable treatment charges against the net proceeds of a judgment or settlement or compromise in favor of a person injured through the fault of a third party.
The statute has been strictly construed. One Louisiana appellate court has held that the scope of the privilege does not encompass interest or charges for late payments since such charges are not for health care services. Allen & Norman, LLC v. Chauvin, XXXX-XXXX (La.App. 1 Cir. 6/29/05), 916 So.2d 1071.
La. R.S. 9:4752 itself does not create a cause of action in favor of the hospital directly against the insurer. The hospital is a creditor of the patient who incurs the bill; the patient is a creditor of the tortfeasor or his insurer that owes benefits to him. Richland Parish Hospital Service District # 2 v. Hanover Insurance Companies, 486 So.2d 1079 (La.App. 2 Cir. 1986). The privilege afforded by the statute is simply an accessory right to the primary obligationa form of security for ultimate payment. Richland, supra at 1083. An accessory right or obligation may not exist without the coexistence of a primary obligation to which it lends support. Louis Werner Saw Mill Co. v. White, 16 So.2d 666 (La.App. 2 Cir.1942), reversed on other grounds, 205 La. 242, 17 So.2d 264 (1944). Stated simply, the obligation of the patient to pay reasonable treatment charges is not incurred as a result of the lien, but arises out of the underlying contractual relationship between the hospital and patient. Hence, although the statute affords a health care provider a privilege on the settlement proceeds for reasonable charges or fees by the health care provider, the charges or fees themselves do not arise from the privilege, but from the primary obligations between a health care provider and the patient. This relationship is contractual. Spencer v. West, 126 So.2d 423 (La.App. 2 Cir. 1961).
The contractual relationship between a health care provider and patient may result from an express or implied contract, and the rights and liabilities of the parties thereto are governed by the general law of contract. Spencer, supra. In the absence of a definite agreement as to what charges are to enter into the contract, the health care provider may decide upon and fix the charges, which must be reasonable. "Our courts have never hesitated to reduce such charges where the proof disclosed they were unreasonable and excessive." Spencer, supra at 428. See also, 16 A.L.R.5th 262, 323 § 20. Although a claim of "unreasonable or excessive fees" is generally a defense asserted by the patient in an action by the health care provider against the patient to collect fees, we see no reason why a patient cannot raise the issue of whether a hospital's charges are reasonable in a judicial proceeding [as a defense against enforcement of the lien]. See, e.g., Doe v. HCA Health Services of Tennessee, Inc., 1999 WL 652003 (Tenn. Ct.App. Aug 27, 1999) aff'd 46 S.W.3d 191 (Tenn. May 24, 2001). (Suit based on breach of contract that hospital charges were unreasonable). See also, 16 A.L.R.5th 262, supra. (An injured person or his legal representative may apply for order determining the validity of hospital lien and fixing of the amount thereof, and if there is a bona fide dispute as to charges, fixing the amount of reasonable charges.)
*1254 In Allen & Norman, LLC v. Chauvin, supra, the issue of whether the late charges and interest on the medical treatment charges was subject to the privilege was raised in a concursus proceeding initiated by the patient's attorneys. Although the court found that the lien did not extend to interest or late fees, this did not mean that the hospital could not attempt to collect those contractual charges without the benefit of the lien. Hence, the privilege afforded by the lien statute is not necessarily coextensive with the contractual rights of the parties.
In Dearing v. Schwab, 525 So.2d 211 (La.App. 1 Cir.1988), writ denied, 530 So.2d 90 (La.1988) the plaintiffs filed a motion to quash the Medical Center's lien in a wrongful death action after reaching a settlement with the tortfeasor who was only 25% at fault, while their deceased son who had incurred the treatment charges was 75% at fault. The trial court found that the Medical Center's fees were reasonable, but reduced the lien amount by 75% based on comparative fault. On appeal, the First Circuit reversed, holding that the court did not have the authority to reduce the lien and, the Medical Center could recover the full amount of the bill since the court had determined that the medical charges were reasonable.
Our review of cases from other states that have similar hospital lien statutes reach a similar result. Courts have generally held that they do not have the equitable authority in the face of the clear language of a statute to reduce the amount of the lien for reasonable charges. On the other hand, a court may adjust unreasonable charges pursuant to the contractual obligations between the patient and the health care provider. Accordingly, the plaintiffs' claims that WKMC's chargemaster rates are unreasonable per se or that it is unreasonable for WKMC to charge uninsured and insured plaintiffs the chargemaster rate must ultimately be based in contract arising out of a health care provider's obligation to render treatment at a fair and reasonable price. Neither the parties nor our own research have disclosed a Louisiana appellate case considering the issue of "reasonable value" of medical goods and services provided by a hospital to a patient. However, appellate decisions from other states suggest that "reasonable value" in such cases is to be determined by considering the hospital's internal factors as well as the similar charges of other hospitals in the community. See Galloway v. Methodist Hosp., Inc., 658 N.E.2d 611, 614 (Ind.Ct.App. 1995) (In a case where the hospital controller's testimony that the "hospital's charges were comparable to other facilities in northwest Indiana ... [and that] the hospital's charges were based on the hospital's budgetary needs[,]" the court found that "[t]he fact that the hospital's charges are based on the costs associated with providing health care does not make the charges unreasonable"); Heartland Health Sys., Inc. v. Chamberlin, 871 S.W.2d 8, 11 (Mo.Ct.App.1993) (the testimony of the hospital representative that "she was familiar with the customary charges in the medical industry for services of the same type as those rendered to [the patient]" was sufficient to make prima facie case for the reasonable value of the services rendered); Victory Mem'l Hosp. v. Rice, 143 Ill.App.3d 621, 97 Ill. Dec. 635, 493 N.E.2d 117, 120 (1986) ("Any assessment of the reasonableness of a private hospital's charges must include consideration and recognition of the particular hospital's costs, functions and services to make a valid determination of whether such charges were reasonable for that hospital alone or compared to the charges of other area hospitals"); Ellis Hosp. v. Little, 65 A.D.2d 644, 409 N.Y.S.2d 459, 461 *1255 (1978) (Proof of the reasonable value of services included testimony that "the cost of the hospital's operation was the basic consideration in establishing the charges for the services rendered" and that "the charges set forth in decedent's ledger were ... similar to those at [another hospital in the community]"). In the instant case, evidence was adduced by the parties in the class certification hearing that tended to focus on the same considerations in the cases cited above.

Summary of Testimony and Evidence
Ingo Angermeier and Todd Welter testified on behalf of the plaintiffs at the certification proceeding. Mr. Angermeier currently serves as president and CEO of Spartanburg Regional Health Care System, which consists of three hospitals and is comparable in size to WKMC. Mr. Angermeier testified that a hospital develops its chargemaster by first estimating the number of patients they expect in each treatment category and payor class.[4] The estimated income from those classes is calculated, and then a multiplier of what they need to charge in order to obtain a certain net income is created. The hospital must consider future capital needs, "technology creep," needed buildings and equipment, and long-term capital needs.
Mr. Angermeier stated that the national average markup above the cost of providing services is about 2.3 or 2.4 times the cost. This number ranges between 1.9 and 3.0 nationwide for not-for-profit hospitals such as WKMC. He testified that, based on his review of audited financial statements, WKMC's chargemaster mark-up ratios for those respective years was 2.4, 2.5, and 2.6, and this yielded an actual net profit of approximately only 3%, which he considered to be very small and inadequate. According to Mr. Angermeier, when the sum of payments from all payor classes are combined, WKMC expects to receive only about 39% of its total chargemaster charges.
Because personal injuries occur across the spectrum of payor classes, Mr. Angermeier observed that WKMC does not create a special payor class for those patients injured due to the fault of third parties, nor create a payor class for liability insurance. Its general practice was to charge the full chargemaster rate to these patients, file a lien for that amount rather than bill the patient's insurance company at the discounted rates under the insurer's provider agreement with the hospital.
Mr. Angermeier stated that he did not believe that chargemaster charges are reasonable for someone who has medical insurance, or is eligible for Medicare or Medicaid, and who would ordinarily receive discounts. However, he stated that Medicare and Medicaid allow hospitals to do this. He stated that he believed that chargemaster charges are reasonable for uninsured patients. On the other hand, he stated that it was not appropriate to expect all uninsureds to pay one hundred percent of the chargemaster rate.
Mr. Angermeier stated that chargemasters contain charges for five to ten thousand items, and, in general, each item is not individually negotiated with an insurer. On the other hand, some things are individually negotiated, such as certain surgical procedures like heart surgery, burn cases, and bone marrow transplants, which he referred to as "carve outs."
Mr. Angermeier stated that, assuming a jury found that the hospital's charging practices were inappropriate, it would be *1256 very reasonable that a hospital could go back and calculate the discounts for a category of injured patients without having a trial for each individual.
Mr. Angermeier acknowledged that hospitals routinely send bills for the full charges to all payors and patients, but the hospital may accept less payment back. Mr. Angermeier agreed that in some cases it is appropriate for the patient to pay the full amount. He is not aware of what percentage of patients actually pay full charges at WKMC. He acknowledged that hospitals might also reasonably consider ownership of assets in determining the acceptable amount of payment.
Todd Welter, owner of a managed care consulting firm, R T Welter and Associates, in Denver, Colorado, testified regarding coding and billing practices. He stated that chargemasters consists of thousands of coded items for services. Hospitals review their chargemaster yearly, adjusting their prices to what the market will bear.
Mr. Welter testified that his firm could easily calculate any refunds due to insured patients whom WKMC might have incorrectly failed to bill the insurer, notwithstanding the fact that the thousands of coded items for products and services in a chargemaster are adjusted yearly. He stated that he would not need to consult with patients individually, only look at their bill, and, in most cases, simply the total bill of the patient. He stated that it would not matter when the patient arrived at the hospital.
Mr. Welter testified that health plans or managed care plans often pended or denied claims when it looked like there was a third party liability insurer that might be responsible. He admitted that he never stated in his deposition that it was improper for a hospital to bill a liability insurer as primary.
Patricia Parker Fuller, director of business office operations for WKMC, testified about its billing practices. She stated that she oversees billing and collecting of accounts for Willis-Knighton. She stated that when a patient comes to the hospital, he or she meets with an admissions office representative and fills out a registration form. Information is gathered and entered electronically. The patient then receives services and the departments rendering services enter the charges for their services. Afterwards the medical records department codes the diagnosis and procedures. The account is then ready for final billing.
Among the items in the patient registration form in use since January of 1999 is a "payment guarantee and assignment of insurance benefits." Ms. Fuller read the following language from the form to the court:
Debtor hereby absolutely assigns to WKMC all insurance benefits on all policies of insurance under which debtor is an insured whether hospital, medical or liability insurance; and also hereby absolutely assigns to WKMC the proceeds of any judgment or settlement of any claim against any third party, and any and all other amounts which may be determined in any manner to be payable to the debtor in connection with any injuries suffered by patient which gives rise to the indebtedness incurred during this period of hospitalization. I hereby authorize WKMC to obtain any information or copies of any accident reports or other documents with regard to such injuries and agree to cooperate with WKMC in connection with the procurement of any information or documents it deems in its sole discretion necessary or appropriate in connection with the assignment made pursuant to this paragraph. I hereby authorize and direct *1257 that all such payments and proceeds shall be made directly to WKMC under the terms of this assignment.
WKMC contracts all of its third party liability collections to a firm called Health One. Ms. Fuller testified that prior to contracting with Health One for these situations, WKMC billed the patient's health insurance company. She testified that the health insurance company would either pend or deny the claim until they determined if they were responsible.[5] She said Medicare has strong regulations regarding what accidents can be filed, and Medicaid is regulated such that they are always the payor of last source. Health One offered to do all of the labor-intensive work in identifying who was responsible in a third party liability situation.
WKMC began using Health One in January of 1999. WKMC gave Health One the information about their accident patients. Health One would in turn investigate to determine if another party was responsible, what insurance was involved and identify the attorneys, if any, involved. They filed lien letters on behalf of WKMC.
Regarding uninsured patients, Ms. Fuller said that the hospital renders services to uninsured patients and are either paid only a portion of their charges or never paid. She said uninsured patients rarely pay the full amount of their charges. Regarding insured patients, she said that WKMC did not collect co-pays and deductibles required under the patient's health insurance.
WKMC has between fifty and sixty managed care contracts. Each contract has various contracted rates, and within those various contracted rates, there are different benefit levels. Employers determine what benefit levels they want for their employees, and the contract is tailored to meet those levels. Additionally, Ms. Fuller stated that there are different reimbursement methodologies within each contract. For example, there are different per diems depending on the type of services, such as medical per diems, surgical per diems, and a per diem for heart rates. There are also case rates, such as ambulatory surgery categories, percentage of charges, and ER case rates. Contrary to the testimony of Mr. Angermeier, Ms. Fuller stated that very few insurance [coverage contracts] are just a flat percentage of full charges.
Ms. Fuller stated that the concept of coordination of benefits refers to situations where there is more than one payor source, such as two groups of insurance. Some payors are primary over others; for example, Worker's Compensation is primary over health insurance. She stated that liability insurance is primary over health insurance. Medicare is always secondary to any third party liability and automobile insurance. Special rules apply to persons over 65 who are still working under an employer's group plan. Medicaid, on the other hand, is always the payor of last source, including cases of third party liability.
Ms. Fuller testified that in some cases patients and/or third party liability insurance carriers have asked that the bills be submitted to them, and in some cases patients have asked that the bill be submitted to their own health or indemnity insurance. Ms. Fuller stated that she decided the latter requests on a case-by-case basis, depending on the funds available. In cases where there were limited funds [from the liability insurer] to pay everyone, *1258 she would honor the request and file for health insurance coverage. She stated she generally tried to honor the request if she could, but if she believed there were plenty of funds available for everyone to be paid, then she might deny the request.
Beginning January 1, 2004, WKMC changed its practices regarding billing health insurance companies in accident related cases. She stated that the change in procedure arose from a new regulation that requires all healthcare providers to send a copy of billing claim forms, known as the "UB92" and the "1500", to a patient or their authorized representative within 10 days of a request. She stated that many attorneys began requesting these forms, but were insufficiently documenting the claims under the particular provider agreements, so the forms would be sent back to the hospital. Ms. Fuller stated that because WKMC has very sophisticated billing software that is able to perform the proper billing edits (different insurance companies require different information in the claim form), it was easier for WKMC to start submitting the bills directly to the health insurance companies. Patients still receive monthly statements; however, each statement indicates that it is not a bill, unless the matter is patient responsibility.
Ms. Fuller testified regarding the representatives of the plaintiff classes and outstanding balances owed. She said there are thousands of people in the putative class that owe outstanding balances similar to Brandi Howard and Donna Atkins, the class representatives, and WKMC has filed reconventional demands for payment of past due balances for services rendered that are unrelated to an accident.
Regarding the chargemaster, Ms. Fuller stated that the charges for a service are the same [rate] irrespective of whether the patient is uninsured, has health insurance, or is eligible for Medicare or Medicaid. Although all patients are billed at the chargemaster rate, the amounts collected vary greatly, depending on the payor. She stated that there are instances when WKMC accepts less than one hundred percent of the charges in accident related cases. This occurs when there are limited funds to pay all sources. When the other health care providers and attorneys agree to reduce their charges, WKMC has also done so. She states that WKMC usually agrees to take the same percentage as the others. She stated that the financial status of the patient is also considered.
Elaborating, Ms. Fuller stated that if the patient has health insurance, the agreement may be that they just take that portion of it. They then file the remainder of the bill to the insurance company showing how much liability had paid directly and let them process the claim based on the contract. The same can be done with Medicare and Medicaid. If there is anything up to the insurer's allowable that is still left, they would pay that amount. Otherwise, WKMC will write-off the difference according to the contract. In cases of an uninsured, if she agrees to a settlement, then she writes off the unpaid balance. If there is no settlement and she receives only partial payment, then she sends statements to the patient with the expectation that the patient will contact her to let her know if they have the ability to pay.
Ms. Fuller was able to produce 22 letters showing a reduction in charges out of approximately 17,000 total class members. She stated that there were more than that amount, but she had not personally done a search, and the letters came from Health One at her request.
Edward Sherman, a professor at Tulane Law School, appeared on behalf of the defendant to give an opinion on class certification. He opined that the current case *1259 is not suitable to be certified as a class action because the "reasonableness inquiry" would involve too many individual issues. For example, he noted that the reasonableness inquiry will involve considerations of ability to pay, property ownership, and the provisions of an insurance policy and so on. Class action certification would deny the defendant the right to present evidence contrary to the plaintiffs' general argument that the chargemaster is unreasonable.
Mr. James Abernathy, co-managing director of Navigant Consulting, a health care consulting firm, testified regarding reimbursement practices of hospitals. He stated that generally liability insurance carriers do not negotiate discounts with hospitals. Because in accident situations liability and automobile insurers are considered primary, which means they pay first, and because they have not negotiated any discounts with the hospital, they would be charged the full chargemaster rate.
Mr. Abernathy stated that he reviewed the Health One data regarding WKMC's accident patients and determined that among the various insurance company HMOs, PPOs, indemnity plans, point of service plans, managed care plans and so on, there were at least six hundred and sixteen (616) insurance plans or plan types. He also stated that there were numerous variances within plans regarding deductibles, co-pays, out-of-pocket expenses, non-covered charges and so on.
Dr. William Cleverly testified as an expert in hospital financial matters. He stated that his consulting firm also advises hospitals in the development of their chargemasters. He stated that there is a distinction in the hospital industry between charges and the amount received, the latter being referred to in the industry as reimbursement. Regarding the development of the chargemaster, he stated there is no established, universally used method, but generally the considerations involve (1) covering the hospital's total costs; (2) meeting the profit objectives, as to which he opined, as did Mr. Angermeier, that WKMC's profit margin is too small; and, (3) the payor mixes, which he says has a tremendous impact on individual rates.
Dr. Cleverly stated that there were two ways to access the reasonableness of charges. One way is to examine the prices relative to those of other hospitals, and the other is to look at profit or return on investment criteria. He stated that payor contracts can be very complex: there may be certain per diem arrangements and special carve outs. Some case arrangements may be DRG (diagnosis related group), a concept used by Medicare for payment that has been adopted by some health plans.

The Uninsured Subclasses One and Two
In denying certification of subclasses one and two, the uninsured accident victims, the court concluded that the evidence was uncontroverted that WKMC's charges reflected on the chargemaster are reasonable, noting that WKMC's profit was typically 3% or less, and that overall, WKMC collected only 39% of its chargemaster rate. Hence the court concluded that there was no basis to certify on this issue.
Additionally, the court concluded that even if there were some evidence that the charges were unreasonable, plaintiffs' theory of reliefthat the court should establish what constitutes reasonable pricesis a "novel and untested theory," and such matters are best left to market forces or the legislature. Accordingly, it concluded that the matter is not appropriate for class certification.
By their first assignment of error, the uninsured plaintiffs allege that the trial court erred in failing to certify their two *1260 subclasses based on the finding that WKMC's charges billed to the members of these classes were reasonable. They contend that this is a question of fact applying to all four subclasses to be determined on the merits of the case, citing Schexneider v. Energy Louisiana, Inc., 04-636 (La. App. 5 Cir. 3/29/05), 899 So.2d 107, writ denied XXXX-XXXX (La.12/9/05), 916 So.2d 1058, for the point of law that review of a trial court's ruling is based on the criteria for certification, not on whether plaintiffs will prevailclass action certification is purely procedural and likelihood of success on the merits is not part of certification process. Additionally, the plaintiffs contend that the determination whether the charges are reasonable is not a novel or "untested theory." On the contrary, they argue, courts have made "reasonableness" determinations for decades.
WKMC contends on appeal that plaintiffs are misconstruing the language in the trial court's reasons for judgment denying certification of subclasses one and two, insisting that the court made no "merits decision" based on the reasonableness of WKMC's charges. Instead, defendant characterizes the court's decision as simply "finding no basis to certify a class on this issue," i.e., the issue of "reasonableness," which means, it argues, that the court found that there was no way these claims could be tied together in a single trial on the merits because plaintiffs failed to demonstrate how they could prove the alleged "unreasonableness" of WKMC's charges on a class-wide basis.
Next, WKMC argues the plaintiffs have presented irrelevant evidence and inapposite cases to dispute the trial court's second ground for denying certification; namely, that the plaintiffs' theory of recovery based on unreasonableness presented a "novel and untested theory" of recovery. The gist of defendant's argument is that each question of "reasonableness" with respect to medical charges must be determined on a case-by-case basis because the medical treatment and related charges arising there from are variable and specific to each individual plaintiff.
An appeal lies from the judgment itself, not the reasons for judgment. Wilson v. Wilson, 30,445 (La.App. 2 Cir. 4/9/98), 714 So.2d 35; Welborne v. Welborne, 29,479 (La.App. 2 Cir. 5/7/97), 694 So.2d 578, writs denied 97-1800 (La.10/13/97), 703 So.2d 621 and 97-1850 (La.10/13/97), 703 So.2d 623; La. C.C.P. art. 2083. When the record reveals a reasonable factual basis for the findings of the trier of fact, and those findings are not manifestly erroneous, an appellate court should affirm the judgment made in the lower court. Welborne, supra.
After reviewing the record in this instance, for the following reasons, we conclude that the trial court did not err in its conclusion that the actions by the two subclasses of uninsured patients are not well-suited for class certification.
As outlined above, Article 591(A) presents five threshold requirements: numerosity, commonality, typicality, adequacy of representation, and identifiability.[6] These requirements are necessary but not alone sufficient; a putative class also must fall into one of three subcategories of Article 591(B). The party seeking class certification bears the burden of proving that all of Article 591's requirements have been satisfied. A trial court must conduct a *1261 "rigorous analysis" of these prerequisites before certifying a class. In so doing, a trial court should accept a plaintiff's allegations as true, but, importantly, may look beyond the pleadings to determine whether class certification is appropriate. See Gen. Tel. Co. of Southwest v. Falcon, 457 U.S. 147, 161, 102 S.Ct. 2364, 2372, 72 L.Ed.2d 740 (1982); see also Castano v. Am. Tobacco Co., supra at 744. ("In order to make the findings required to certify a class action under Rule 23(b)(3), one must initially identify the substantive law issues which will control the outcome of the litigation." Alabama v. Blue Bird Body Co., 573 F.2d 309, 316 (5th Cir.1978).

Numerosity
The first prerequisite for maintaining a class action established by La. C.C.P. art. 591(A)(1) is that the members of the class be so numerous that joinder is impracticable; this is sometimes called the "impracticality" or "numerosity" requirement. The numerosity requirement has been explained as follows:
This requirement reflects the basic function of the class action as a device for allowing a small number of persons to protect or enforce rights or claims for the benefit of many where it would be inequitable and impracticable to join every person sharing an interest in the rights or claims at issue in the suit.
Kent A. Lambert, Certification of Class Actions in Louisiana, 58 La. L.Rev. 1085 (1998).
Generally, a class action is appropriate whenever the interested parties appear to be so numerous that separate suits would unduly burden the courts, and a class action would "clearly be more useful and judicially expedient than the other available procedures." Cotton v. Gaylord, 96-1958 (La.App. 1 Cir. 3/27/97), 691 So.2d 760, 768, writ denied 97-0800 (La.4/8/97), 693 So.2d 147. Determination of whether this requirement has been fulfilled depends on the facts and circumstances of each individual case. Dumas v. Angus Chemical Co., 25,632 (La.App. 2 Cir. 3/30/94), 635 So.2d 446, 450, writ denied 94-1120 (La.6/24/94), 640 So.2d 1349.
The determination of numerosity in part is based upon the number of putative class members, but is also based upon considerations of judicial economy in avoiding a multiplicity of lawsuits, financial resources of class members, and the size of the individual claims. Davis v. American Home Products Corp., XXXX-XXXX, p. 19 (La.App. 4 Cir. 3/26/03), 844 So.2d 242, 257, writ denied XXXX-XXXX (La.6/27/03), 847 So.2d 1279.
In the instant case, it is alleged that there are approximately 4,500 members in subclass one and 1,700 members in subclass two. Plaintiffs obtained these figures from discovery from WKMC. Additionally, Health One or WKMC should have the names and addresses of these individuals in their databases. Since there are a significant number of plaintiffs involved in each of these subclasses, joinder would be an impractical alternative in either case. We find that the plaintiffs have satisfied the numerosity requirement for class certification.

Commonality
Article 591(A)(2) requires that there are questions of law or facts common to the class. Some courts have stated that the test of commonality is not a demanding one, and requires only that there be at least one issue, the resolution of which will affect all or a significant number of the putative class members. Duhe v. Texaco, Inc., 1999-2002 (La.App. 3 Cir. 2/7/01), 779 So.2d 1070, writ denied, XXXX-XXXX (La.4/27/01), 791 So.2d 637; Mullen v. *1262 Treasure Chest Casino, LLC, 186 F.3d 620 (5 Cir.1999), cert. denied, 528 U.S. 1159, 120 S.Ct. 1169, 145 L.Ed.2d 1078 (2000). A common question is defined as one which when answered as to one class member is answered to all of them. Duhe, supra; Forbush v. J.C. Penney Co., Inc., 994 F.2d 1101 (5 Cir.1993). On the other hand, other courts state that commonality is met when the common questions of fact and law predominate over issues or defenses affecting only individual class members, although this closely resembles the requirement under Article 591(B)(3). See Cotton v. Gaylord Container, supra at 771. See also, 58 La. Law Rev., supra at 1093 ("Indeed, a dispute exists as to whether more than one common questionno matter how critical or fundamental that issue may beis necessary.").
In this case, the uninsured plaintiffs contend that the common question is whether the charges made by WKMC are reasonable, as is contemplated by the Louisiana Hospital Lien Statute. However, as we previously noted in this opinion, the privilege afforded by the lien is simply an accessory right to aid in enforcement of the hospital's contractual obligation to charge reasonable fees. The lien statute merely provides a means to collect, not a basis to charge.
As the trial court apparently observed, if the plaintiffs' claim is that the chargemaster rates are unreasonable in general or "across the board," not only must this claim fail for lack of any evidence (indeed, the evidence is overwhelmingly against such a conclusion), the plaintiffs' notion that a court rather than market forces or legislative action should establish across the board hospital rates is "at best, a `novel and untested' theory of law and not appropriate for class certification." On the other hand, we think it is possible that the plaintiffs' complaint is that WKMC used the lien statute to enforce collection of the full chargemaster rate from the uninsured plaintiffs, and this practice is unreasonable. See, e.g., Garner v. Houston, 323 S.W.2d 659 (Tex.Civ.App. 1st Dist. 1959). (Whether charges in a hospital lien were reasonable and customary was a question of fact as to whether the charity hospital regularly or customarily made any charge for services to person in the patient's financial condition.) Restated as a question common to the class of uninsureds, the question is whether WKMC's practice of billing and collecting the full chargemaster rate from uninsured patients violates its contractual obligation and exceeds its statutory lien authority to bill and collect reasonable charges.
As noted in Castano, supra, the commonality inquiry requires the court to go beyond the pleadings and identify the substantive issues that will determine the outcome of the litigation. Even if we were to assume that there is simply the one issue, that is, whether the charges and collection of the chargemaster rate is excessive, by applying the "one common question" rule cited above, the commonality requirement must fail in this case because the answer to the common question as to any one member of the class will not answer it for all members, as is required to meet commonality. The testimony given in this case establishes that it is common practice to bill all patients the full chargemaster rate, but collection of that amount is contingent on a myriad of individual circumstances. Although Mr. Angermeier testified that he did not think it is appropriate to collect the full amount from uninsured patients, he agreed that it is appropriate in some cases for patients to pay the full amount. Ms. Fuller testified that the hospital, in many cases, discounts the bill according to the patient's circumstances, including the *1263 amount of money available and the financial status of the patient. Thus, the reasonableness of charges inquiry requires individual considerations that may include, for example, the patient's financial status, the actual hospital services rendered, their customary value, and the amount of a recovery from a third party or his insurer, if any.
The fact that WKMC entered into agreements with health insurers that provide for discounted rates to insured patients does not prove that the hospital's chargemaster is unreasonable with respect to uninsured patients. See Hillsborough County Hosp. Authority v. Fernandez, 664 So.2d 1071 (Fla.App. 2 Dist. 12/1/05). ("Evidence that the hospital entered into contracts with managed care payors whereby they received discounts from the hospital for treatment of their plan participants, standing alone, was insufficient to prove that the hospital's charges were unreasonable and that the hospital's statutory lien for reasonable charges for hospital care should be reduced by 38%").
Additionally, the supreme court of Louisiana has stated that when the plaintiffs' individual liability issues predominate over the issue of the defendant's duty, a class action certification is not appropriate. See Article 591(B)(3). When there are a myriad of individual complaints that ultimately will require plaintiff-by-plaintiff adjudication of liability issues, this will militate against a finding of predominance of common character and the superiority of the class action procedure. Banks v. New York Life Insurance Co., 98-0551 (La.7/2/99), 737 So. 2d 1275, 1281, cert. denied, Major Banks v. New York Life Insurance Co., 528 U.S. 1158, 120 S.Ct. 1168, 145 L.Ed.2d 1078 (2000).
Accordingly, we conclude that the trial court did not err in denying certification of the class of uninsured plaintiffs. Because we conclude that plaintiffs have not shown commonality or that common issues predominate over individual issues, we do not evaluate the plaintiffs' showing for the other required elements.

The Insured Subclasses Three and Four
WKMC argues that the court's ruling certifying subclasses (3) and (4) should be reversed, arguing among other things, that the court erroneously found the plaintiffs met the requirements of Article 591(B)(3), namely, that common issues of law and fact predominate and class certification is a superior method of adjudicating the matter. WKMC also alleges that the court erred in finding that the named plaintiffs meet the typicality and adequacy of representation requirements under Article 591(A). Based on our review of the record, testimony and exhibits, we find no manifest error in the trial court's conclusions.
WKMC insists that individual issues predominate this case, again reciting the fact that there are numerous insurance contracts, defenses individual to each plaintiff, different insurance discounts, deductibles, co-payments, and specifications regarding who is primary and secondary. The court, however, found that the single common issue for each class member is "whether the Lien Statute allows WKMC to bill and collect chargemaster rates instead of the patient's lower provider agreement rates." WKMC argues that the answer to this question will vary from member to memberi.e., the question whether a patient is entitled to a discounted rate requires an individual factual determination because, according to WKMC, there is no homogeneity among provider contracts regarding issues of payment from third-party insurers, rates, and so on. Also, it contends, there are contract-specific, fact-specific and plaintiff-specific defenses. *1264 WKMC has different rights of collection under each of the provider contracts that go beyond the amount of charges.
Additionally, WKMC contends that class action is not a superior method of adjudication in this case. There are apparently 8,000 members to the class. WKMC contends that the class is unmanageable because of all the individual differences noted above.
We disagree.
In determining whether common issues predominate, courts generally engage in a three-step analysis: (1) first, the court must identify the substantive elements of the cause of action; (2) the proof necessary to meet the plaintiff's burden of proof as to those elements must be considered; and (3) the alternative procedural mechanisms for adjudicating the case must be evaluated in terms of promoting judicial economy. The fact that each class member seeks separate damages, or that each claim arose out of separate transactions with the defendant is not necessarily dispositive. The question is whether common issues of law and fact in each class member's claim predominate. 58 La. Law Rev. 1085 at 1102, n. 102 (citations omitted) "A single common issue may be the overriding one in the litigation, despite the fact that the suit also entails numerous remaining individual questions." Id. (citations omitted).
We have previously noted that the basis of any claim regarding the reasonableness of the hospital charges arises ex contractu. Although there is testimony that there are between 50 and 60 different insurance companies who have provider agreements with WKMC and possibly more than 600 different plan variations within those agreements, we do not see this as an obstacle to class certification. The single, overriding question in this case is whether WKMC has violated an obligation to charge those patients with insurance at the discounted rates. In the absence of an agreement in the contracts, the question is whether such practice is "reasonable and customary." The fact that the provider contract discount rates may vary, or that individual patients received different services, or that different deductibles and co-payments may be required to be calculated, or that outstanding balances may have to be recalculated and discounted, does not seem to provide any problem for WKMC in its ordinary, non-injury related cases. We see no reason why it would require case-by-case adjudication in this case, and the testimony in this case supports this conclusion.
We also believe that class action is a superior method of adjudicating the controversy. There are allegedly as many as 8,000 class members in subclasses three and four. Absent certification, many of the members of the putative class will have claims whose value is too small to warrant individual litigation. On the other hand, WKMC contends that the class will be unmanageable because of the highly individualized issues in the case. As previously stated, we are not persuaded that the alleged individual issues of liability as well as individual issues of damages present an obstacle to class certification. Again, these are issues that WKMC deals with every day in non-personal injury cases. We cannot see why it now becomes an insurmountable task to determine issues of insurance coverage and balances due or not due once the predominant issue in this case is resolved.

Typicality and Adequacy of Representation
WKMC also contends that the typicality and adequacy of representation elements of Article 591(A) are not met. *1265 The element of typicality "determines whether a sufficient relationship exists between the injury to the named plaintiff and the conduct affecting the class, so that the court may properly attribute a collective nature to the challenged conduct . . . . A plaintiff's claim is typical if it arises from the same . . . course of conduct that gives rise to the claims of other class members, and if his or her claims are based on the same legal theory." 58 La. Law Rev. at 1094, quoting 1 Newburg on Class Actions, § 3.13, at 3-76-77. The element of typicality requires that the claims of the class representatives be a cross-section of, or typical of, the claims of all class members. Andry v. Murphy Oil, U.S.A., Inc., 97-0793, p. 5 (La.App. 4 Cir. 4/1/98), 710 So.2d 1126, writ denied 98-C-1158 (La.6/9/98), 720 So.2d 1213 and writ denied 98-C-1178 (La.6/9/98), 720 So.2d 1214. Louisiana jurisprudence does not require a "Noah-like" tabulation of class representatives and claims. Johnson v. Orleans Parish School Board, XXXX-XXXX, p. 10 (La.App. 4 Cir. 6/27/01), 790 So.2d 734, 742, writs denied 2001-2216 and 2001-2225 (La 11/9/01), 801 So.2d 378 and writ denied 2001-2215 (La.11/9/01), 801 So.2d 379. The plaintiffs are not required to produce two, or even one, of every kind of claim or of every person included in the class.
Donna Atkins and Bessie Tyler are the named class representatives for the insured subclasses. WKMC argues that, given the individual issues presented, there are no "typical" patients with "typical injuries." Again, the argument is that each insured patient's claim involves one of many underlying provider agreements and individual issues of whether a plaintiff received covered services under the contract. They submit that Atkins' and Tyler's claims are only typical of those individuals covered under the same health insurance provider contracts.
We do not agree with this reasoning. The overriding question is whether it was appropriate for WKMC to ignore a patient's health insurance and the discounted rates negotiated therein. This question supersedes the secondary question of the extent of coverage under the plan. This overriding question is typical to the members of the class.
The following are "factors which may be relevant" to the adequacy of representation inquiry:
(1) The representative must be able to demonstrate that he or she suffered an actualvis-à-vis hypotheticalinjury;
(2) The representative should possess first-hand knowledge or experience of the conduct at issue in the litigation;
3) The representative's stake in the litigation, that is, the substantiality of his or her interest in winning the lawsuit, should be significant enough, relative to that of other class members, to ensure that representative's conscientious participation in the litigation; and
(4) The representative should not have interests seriously antagonistic to or in direct conflict with those of other class members, whether because the representative is subject to unique defenses or additional claims against him or her, or where the representative is seeking special or additional relief.
58 La. L.Rev. 1085, supra at 1117.
The plaintiffs contend that this case is rife with intra-class conflicts between class members rendering it inappropriate for certification. Singleton v. Northfield Insurance Company, 826 So.2d 55 (La.App. 1 Cir.2002), writ denied, XXXX-XXXX (La.9/30/02), 825 So.2d 1200. In support of this claim, WKMC alleges that these representatives and any other class members who owe money to WKMC for services unrelated to their accident claims will have *1266 an interest in resolving those claims at the expense of the hospital lien claims. It is contended that this interest is contrary to those class members who do not have unpaid bills. Additionally, WKMC argues that if they must refund collected charges to patients, they will have to raise rates for future patients.
We consider the second argument irrelevant to this case. As to the first argument, we are not persuaded that because Donna Atkins may have charges due to WKMC that are unrelated to her accident charges, she will act against the interests of the class, particularly if those charges are covered by her health insurance.
Next, WKMC questions the adequacy of the named representatives to serve. They contend that none of the named plaintiffs except Tyler attended any court motions, hearings and other proceedings, except when noticed to appear at their own depositions. Additionally, it contends that the fact that Atkins and Tyler have continued to use WKMC for services unrelated to their accident despite alternative health care facilities in the area casts doubt on their credibility as representatives of the class.
We are not persuaded that the trial court's appointment of Donna Atkins and Bessie Tyler as class representatives for the uninsured subclasses is clearly wrong. The heart of this claim is the question of WKMC's use of the lien statute in the face of insurance coverage, not a question of whether class representatives should develop such a personal animosity toward WKMC that they refuse to seek medical treatment there.

Conclusion
For the reasons stated above, we conclude that the trial court did not manifestly err in its judgment, having correctly and fairly determined the class certification issues in this case. Accordingly, we affirm the judgment at defendant's cost.
AFFIRMED.
APPLICATION FOR REHEARING
Before BROWN, WILLIAMS, STEWART, CARAWAY, and MOORE, JJ.
Rehearing denied.
NOTES
[1] This suit is somewhat similar to a number of suits nationwide filed against not-for-profit, and, in some cases, for-profit hospitals regarding the billing practices of such hospitals for treatment of patients for injuries caused by the fault of a third party. Initially, most of the actions involved uninsured patients filed in federal courts against not-for-profit hospitals based on theories of liability allegedly arising from a hospital's status as a nonprofit entity under the Internal Revenue Code, 26 U.S.C. § 501(c)(3). Plaintiffs argued that their non-profit status obligated these hospitals to provide treatment to indigent or uninsured patients free of charge or at greatly discounted rates. Instead, most hospitals charge uninsured patients their full charges for treatment, while other payors such as Medicare, Medicaid, insurance companies and managed care organizations pay at reduced rates. While it appears that most of these federal cases have been dismissed under Federal Rule 12(b)(6), a second wave of actions has emerged in state courts across the country. This is one such case involving both uninsured and insured patients.
[2] See footnote 1.
[3] As will be discussed herein, a hospital's chargemaster is basically a price list for coded services and supplies used in the treatment of a patient. In Doe v. HCA Health Services of Tennessee, Inc., 46 S.W.3d 191 (Tenn.2001) the court described HCA's chargemaster as a confidential list of charges made by the hospital for all its goods and services, which is used to compute charges for all private commercial patients who are treated on a fee-for-service basis. The chargemaster is compiled and maintained by the hospital's chief financial officer on the hospital's computer system containing the list and prices for over 7,500 items. The hospital's chargemaster is considered confidential proprietary information and is not shown to anyone other than the officers and employees of the hospital and authorized consultants. The chargemaster is adjusted on a weekly basis to reflect current cost data; the hospital's costs are marked up by a mathematical formula designed to produce a targeted amount of profit for the hospital.
[4] Mr. Angermeier defined a payor class as method of payment categories, such as Medicare (40-50%), Medicaid (20%), indemnity and managed care (25%) and single percentages of self-pay and indigent patients.
[5] Contrary to a statement by Mr. Angermeier, several witnesses testified that in cases of accidents, health insurers stipulate that primary liability falls on the tortfeasor and his or her insurer, and the patient's health insurer is secondary.
[6] "Identifiability" has no counterpart in Federal Rule 23. However, the text of this subsection (Article 591 A(5)) tracks well-settled federal case law implying such a provision in Rule 23. See Kent A. Lambert, Certification of Class Actions in Louisiana. 58 La. L.Rev. 1085 at 1110.